43 N.J. Super. 79 (1956)
127 A.2d 885
ALFONSO DALOISIO, JACOB DE YOUNG, ET AL., PLAINTIFFS-RESPONDENTS,
v.
PENINSULA LAND CO., A CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANT-APPELLANT, AND CALLAGHAN ISLAND LAND COMPANY, A CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANT.
Superior Court of New Jersey, Appellate Division.
Argued October 1, 1956.
Decided December 14, 1956.
*83 Before Judges GOLDMANN, FREUND and CONFORD.
Mr. Howard Stern argued the cause for appellant (Mr. Joseph V. Fumagalli, attorney).
Mr. Isadore Glauberman argued the cause for respondents (Mr. Edward A. Smarak, attorney; Mr. Warren Brody, on the brief).
The opinion of the court was delivered by GOLDMANN, S.J.A.D.
Plaintiffs, a minority of the stockholders of Callaghan Island Land Company, instituted this derivative suit to impress a trust upon certain lands, hereinafter described, for the benefit of Callaghan and to compel defendant Peninsula Land Co. to convey the property to that company. The Chancery Division entered judgment in plaintiffs' favor, with costs. Peninsula Land Co. appeals.
*84 The property in question is part of a peninsula of some 22 acres jutting into the waters of Lake Hopatcong. The peninsula is commonly referred to as "Callaghan's Island" and is primarily a summer resort. The stockholders of the Callaghan Company are bungalow owners on Callaghan Island. They had constructed their dwellings on lands occupied under an oral lease arrangement with Daniel Callaghan, a life tenant. They feared that following his death they would be left at the mercy of the remaindermen, who might force them off the peninsula and lay claim to their bungalows. To protect their common interests they formed themselves into an unincorporated association, the Callaghan Island Group. In 1939 an opportunity arose to purchase from Consumers' Coal and Ice Co. a ten-foot strip along the outer perimeter of the peninsula, and also 75 feet of adjoining land under the waters of the lake. To strengthen their future bargaining position with the remaindermen, the bungalow owners incorporated Callaghan Island Land Company and through it acquired the ten-foot strip and the contiguous lands under water by deed of warranty.
Following the death of the life tenant in May 1950 the remaindermen indicated a willingness to sell their interest in Callaghan's Island for $125,000. The Callaghan Company was unable to meet this price, but did offer to buy about half the island for $55,000. The offer was rejected. Subsequently one William Buesing, a Callaghan stockholder, purchased the remaindermen's interest through his corporation, Wilomay Holding Co., after first informing a special meeting of Callaghan shareholders of his intention to do so.
Wilomay proceeded to lay claim to the property which is the subject matter of this suit  a narrow wedge of land on the northern part of the peninsula, lying for the most part south of the ten-foot strip and comprising about an acre, commonly referred to as the "gore." The basis of the claim was that the gore was part of the property purchased from the remaindermen or, alternatively, that title had been acquired by adverse possession. The result was an action to *85 quiet title to the gore, ultimately decided against Wilomay. See Wilomay Holding Co. v. Peninsula Land Co., 33 N.J. Super. 412 (Ch. Div. 1954), 34 N.J. Super. 121 (Ch. Div. 1955), affirmed 36 N.J. Super. 440 (App. Div. 1955), certification denied 19 N.J. 618 (1955),
The Callaghan Company had meanwhile, and since 1950, been negotiating with Consumers' Coal and Ice Co., the true owner, for the purchase of the gore. On August 31, 1952 the Callaghan stockholders formally voted unanimously, except for Buesing, to purchase the gore for $2,300, the money to come from the company treasury and no member assessments to be levied at that time. On December 22, 1952 the stockholders once more voted to purchase the gore, the only negative vote being that of Buesing, who was then prosecuting the Wilomay quiet title suit, claiming ownership of the gore. A contract between Consumers' and the Callaghan Company was entered into the same day. The agreed price was now $2,800, with a down payment of $300. April 1, 1953 was fixed as the date for closing title. By this contract Callaghan also agreed to release Consumers' from its warranties covering the lands under water which it had sold to Callaghan in 1939.
The Callaghan stockholders did not meet again until March 17, 1953. The contract to purchase the gore was discussed and the members arrived at a figure of $4,500 to cover the purchase price and certain incidental expenses, averaging $125 per member. It was then moved that Callaghan proceed with the purchase, "each stockholder wishing to participate to be assessed in the amount of one hundred and twenty-five dollars ($125)." The motion was carried by a vote of 17 to 8, with two abstentions. Those dissenting included Buesing and seven others, each of whom had, between the December 22 and March 17 meetings, purchased from Wilomay Holding Co. the lot on which his bungalow was situated. Several of these stockholders testified that they had opposed the motion, principally on the ground that each member was to be assessed a flat sum, rather than an amount proportionate to his stockholding, the practice previously followed.
*86 As a result of the minority vote against the assessment, the majority of the shareholders, with three exceptions, failed to pay the assessment. The reason was that they were unwilling to contribute their funds to conclude a purchase which would redound to the benefit of those who had refused to pay. Two of the directors who had voted in favor of the assessment, Frank Gavlak, president of the Callaghan Company, and John Capelli, never sent in their checks. Realizing that the assessments were not going to be paid, and fearing (so it is claimed) that if the sale were not consummated by April 1, Buesing might purchase the property, these two directors proceeded to take matters into their own hands. They consulted counsel and two days later, on March 29, 1953, held a meeting at Capelli's restaurant. Some dozen persons attended, among them Gavlak, Capelli and several stockholders who had voted in favor of the assessment on March 17 preceding. No notice of the meeting was given to the stockholders generally. The other three Callaghan directors were not present. Gavlak presented a plan he and Capelli had discussed with counsel for protecting the interests of the majority of shareholders, involving the assignment of the Callaghan Company's contract to a dummy while a new corporation was formed which would subsequently take title to the gore from the assignee. Those present agreed to go along with the plan.
A board of directors meeting followed on March 31, 1953, Gavlak having mailed notice thereof to his co-directors six days before. The board, by a vote of three in favor, one against and one abstaining, Gavlak and Capelli voting with the majority, passed a resolution authorizing a release to Consumers' from its covenants under the 1939 deed to the Callaghan Company, and an assignment to Jennie D. Kuiken, a stenographer, of Callaghan's contract with Consumers', in consideration of her repayment to Callaghan of the $300 deposit it had made. Title was taken in Miss Kuiken's name on April 1, 1953 and subsequently transferred, on May 6, to Peninsula Land Co., a newly formed corporation wholly controlled by Gavlak, Capelli and a group of the majority *87 of the Callaghan shareholders. Gavlak and Capelli sit on Peninsula's board of directors. The money for the purchase of the gore was contributed by those Callaghan shareholders who had voted for the assessment and who ultimately became shareholders in Peninsula. A release of covenants from Callaghan, dated April 1, 1953, was delivered to Consumers'.
No notice of the March 31 meeting or of the intended assignment of Callaghan's rights and the release, or even of the execution of such release and assignment, was ever given the Callaghan stockholders generally. Upon learning of the assignment, Buesing contacted the minority shareholders of Callaghan and induced them to institute this suit alleging a conspiracy on the part of the directors of the Callaghan Company to obtain control of the gore by fraudulent means, seeking to have the property impressed with a trust for the benefit of Callaghan, and demanding a reconveyance of the gore from Peninsula to Callaghan.
The answer of the defendant corporations denied any conspiracy to deprive Callaghan of the benefits of its contract to purchase the gore from Consumers' and to divert and appropriate the property and rights under that contract. It also denied the violation of any fiduciary duty by directors Gavlak and Capelli, as charged in the complaint. Defendants admitted that Peninsula had actual knowledge of the agreement between Callaghan and Consumers' when it took title to the gore. The answer raised the special defenses of (1) estoppel, in that plaintiffs were assuming a position contrary to the one they had taken when the performance of the contract was up for consideration at the meeting of March 17, 1953, and were serving the adverse ends of Buesing; and (2) unclean hands.
In his oral decision the Chancery Division judge reviewed the testimony; held that the Callaghan corporate structure could not be ignored so as to defeat plaintiffs' action; concluded that the Callaghan directors in taking the action they did on March 31, 1953, were not availing themselves of a corporate opportunity but were dealing with a valuable property right of the Callaghan Company for their own *88 advantage; found no logic or equity in the argument that what was done here was for the benefit of the bungalow owners against their common adversary, Wilomay Holding Co., which had taken the place of the remaindermen; and held that defendants had failed to establish the burden of proof cast upon them of showing that "the transaction was fair, free from fraud and not inimical to the interests of the stockholders of the Callaghan Island Land Company," and that "there has been no inequitable conduct on the part of the plaintiffs which would bar them from the relief which they seek here." Accordingly, judgment was entered in favor of plaintiffs directing Peninsula to execute and deliver to Callaghan Island Land Company a deed to the gore, in consideration of the amount paid for the property in accordance with the contract of December 22, 1952 between Consumers' and the Callaghan Company; impressing the gore with a trust for the benefit of that company until such conveyance was made, and ordering Peninsula to pay the costs of suit. This appeal by Peninsula followed.
New Jersey law has characterized the directors of a corporation as fiduciaries and has demanded of them the utmost fidelity in their dealings with the corporation and its stockholders. Hill Dredging Corp. v. Risley, 18 N.J. 501, 530-531 (1955); Eliasberg v. Standard Oil Co., 23 N.J. Super. 431, 441 (Ch. Div. 1952), affirmed per curiam 12 N.J. 467 (1953); Whitfield v. Kern, 122 N.J. Eq. 332, 340 et seq. (E. & A. 1937). The principle, long established in this State, is that directors may not lawfully enter into a contract affecting their corporation, in the benefit of which even one of their number participates, without the knowledge and consent of the stockholders. The personal interest of a director does not render the transaction void per se, but voidable at the option of the stockholders. United States Steel Corporation v. Hodge, 64 N.J. Eq. 807, 813 (E. & A. 1903), reversing 64 N.J. Eq. 90 (Ch. 1902). Such transactions are subject to close scrutiny and must be characterized by absolute good faith, Hill Dredging Corp. v. Risley, above, 18 N.J., at page 531, where it was also said that *89 "Where a director enters into a contract or transaction with his own corporation, without the approval of the stockholders first having been obtained, the burden is upon the director to completely justify the transaction."
The record indicates that following the failure of the assessment payment plan, Gavlak and Capelli abandoned all efforts to acquire the gore for Callaghan, and concentrated on acquiring title for themselves and their faction in the corporation, to the exclusion of the minority of the shareholders. The trial judge found that they "operated secretly for their own advantage and those associated with them, and that they gave valuable property rights away for no consideration." In fact, the only consideration received was the return of Callaghan's $300 deposit.
The utilization of Miss Kuiken and the subsequent incorporation of Peninsula are transparent devices which fail to hide the obvious self-interest of Gavlak and Capelli. As directors they were required to exercise reasonable diligence in attempting to raise the funds necessary to consummate the purchase of the gore. Failure of the flat assessment plan was not necessarily fatal to the purchase. Other means of raising the purchase price were available, such as a mortgage, stockholder loans, or perhaps assessment on another basis. There was no attempt to investigate other possibilities. The fact that Callaghan had approximately $1,700 in its treasury which could have been used to complete the purchase was not even considered by the directors. Nor was there any effort made to extend the closing date. (Here we observe, in passing, that there was nothing in the Callaghan-Consumers' contract, or otherwise, to show that time was of the essence.) The directors clearly did not exercise that diligence which the law expects of them.
While the law does not demand infallibility or the impossibility of error in directors, it does require that they act as reasonable men and in good faith toward their stockholders. Casson v. Bosman, 137 N.J. Eq. 532, 535 (E. & A. 1946). The failure to inform the stockholders of the action contemplated, the failure to exercise diligence in obtaining *90 the funds necessary for the purchase of the gore, the inadequate consideration received by the Callaghan Company, and the establishment of Peninsula Land Co. by Gavlak, Capelli and their associates solely for the purpose of taking title to the gore, are all factors indicating a lack of good faith on the part of the directors, if not a complete abrogation of their fiduciary responsibilities.
Defendant Peninsula attempts to justify the actions of directors Gavlak and Capelli on several grounds. It first contends that they acted in the interest of the majority of the stockholders and in fulfillment of the purpose of Callaghan Island Land Company, which was to protect the bungalow owners against the owner of the fee, at this time Wilomay Holding Company, controlled by Buesing. Assuming this to be true, were the directors justified in disregarding their fiduciary duty to Callaghan and acting in what they now say they thought to be the best interests of the majority of the stockholders, to the detriment of the minority, without at least first consulting the shareholders generally? Is effectuation of the purposes of the corporation to be raised as a shield to protect faithless directors from the claims of an injured minority? To put the question is to answer it. That the interests of the majority may have been served is not the controlling consideration:
"* * * This right of the majority (statutory or other) either to originally direct or to affirm contracts or other proceedings in which the directors or the majority stockholders are interested, is not, however, absolute, but is subject to the necessary qualification that the majority, although they may deal with the assets of the company, cannot so deal with them as to divide these assets, more or less, between themselves to the exclusion of the minority." Colgate v. United States Leather Co., 73 N.J. Eq. 72, 87-88 (Ch. 1907), reversed on other grounds, 75 N.J. Eq. 229 (E. & A. 1909).
Directors, when elected to office, become trustees of the entire body of corporate owners. They owe loyalty not only to the majority stockholders, or to the minority, but to all of them, represented by the corporate entity. To disregard the rights of either group, or of the corporation as *91 such  even for a moment  is a violation of their fiduciary obligation. Gavlak, Capelli and their associates clearly acted without consideration for the rights of the corporation in acquiring the gore for their own purposes.
Defendant's argument is based upon the assumption that reconveyance of the gore to Callaghan will eventually result in its control by Buesing. True, there is strong evidence that the stockholders bringing this action are friendly to him. What effect this alliance may ultimately have on the Callaghan Company and its stockholders cannot, of course, be predicted. We cannot assume that if Callaghan is restored to its rightful ownership of the gore, the result will be detrimental to the interests of the corporation. Such a suggestion lies solely in the realm of conjecture. So far as presently appears, the majority of the stockholders of Callaghan are still beyond the influence of Buesing. We must rely on the wisdom of the corporate management that the gore, once returned to the proper ownership of the Callaghan Company, will be managed in the best interests of the corporation and its stockholders. To indulge such a presumption is entirely reasonable and legitimate.
Peninsula argues that the directors acted to assign the contract only when it became clear that the objection of the minority to the purchase of the gore would result in its acquisition by Buesing. It claims that the stockholders of Callaghan had abandoned their right to acquire the gore under the contract with Consumers'. It further contends that the very stockholders who sought to prevent title from being taken in the name of Callaghan are the plaintiffs in this suit to require a reconveyance from Peninsula to Callaghan; that they should be estopped from changing their position, and such estoppel should extend to the corporation.
There are several answers to these claims. First, there is no proof whatsoever that the stockholders who voted against the assessment resolution at the March 17 meeting were opposed to Callaghan's acquiring the gore. On the contrary, the record indicates that their votes were directed *92 against the proposed method of assessment. Second, there is nothing in the record to show that these stockholders had abandoned the contract. The fact is, they had consistently voted to purchase the gore. Minority opposition to the assessment procedure, or even to the purchase itself, could not justify the directors' assignment of the contract to their own interests. Third, the contention that the corporation is estopped is groundless. We begin with the fact, just mentioned, that there is no proof that plaintiffs were opposed to Callaghan's acquisition of the gore. Even were this shown as to some of the plaintiffs, it should be noted that three of them were not even present at the March 17 meeting. Relief may be granted against illegal or unconscionable acts of a corporate director, notwithstanding acquiescence, ratification or laches of some of the stockholders, if there remains but a single stockholder who is not subject to these defenses. Hill Dredging Corp. v. Risley, above, 18 N.J., at page 531.
Peninsula also contends that the corporate opportunity to purchase the gore had been lost by Callaghan because it was unable to consummate the purchase due to lack of financial resources, and therefore the directors were free to appropriate the opportunity for themselves. This position is untenable. The Callaghan stockholders had voted and formally bound themselves to purchase the gore. Their contract with Consumers' was still outstanding. The method of obtaining money by a flat assessment had failed, but no other method was tried. It cannot therefore be said that no corporate opportunity existed. No choice of action alternative to that finally taken was given to the stockholders in a meeting properly called. Callaghan was not simply deprived of an opportunity; it was stripped of its very real, subsisting equitable rights in the gore acquired under the contract.
It is a universal rule that a director may not purchase for himself property which it is his duty to purchase for the corporation. See, generally, Ballentine, Corporations (1946), § 79, p. 203; 3 Fletcher, Cyclopedia of Private Corporations (1947), § 861, p. 221; 13 Am. Jur., *93 Corporations (1938), § 998, p. 950; 19 C.J.S., Corporations (1940), § 777, p. 144; 50 Mich. L. Rev. 471 (1952). The inability of the corporation to take advantage of the opportunity because of lack of funds may not be relied upon by directors when their own lack of diligence was responsible for the corporation's momentary fiscal condition. Even legitimate lack of funds would not excuse the directors' failure to dispose of the corporate property in a manner consistent with the best interests of the corporation, rather than for their own interests.
Defendant asserts that the directors acted within the proper limits of their managerial discretion in assigning the contract. We recognize the basic principle laid down in Ellerman v. Chicago Junction Railways, etc., Co., 49 N.J. Eq. 217, 232 (Ch. 1891), and cited by defendant, that
"Individual stockholders cannot question, in judicial proceedings, the corporate acts of directors, if the same are within the powers of the corporation, and, in furtherance of its purposes, are not unlawful or against good morals, and are done in good faith and in the exercise of an honest judgment. Questions of policy of management, of expediency of contracts or action, of adequacy of consideration not grossly disproportionate, of lawful appropriation of corporate funds to advance corporate interests, are left solely to the honest decision of the directors if their powers are without limitation and free from restraint. To hold otherwise would be to substitute the judgment and discretion of others in the place of those determined on by the scheme of incorporation."
But plaintiffs are not questioning the directors' acts for the reason that they were impolitic or merely inexpedient. They charge that the directors acted in bad faith and failed to exercise honest judgment. Under such circumstances the court will interfere.
The Ellerman rule, granting wide discretion to corporate directors, is sound, but it is obviously inapplicable to a situation involving fraud, self-dealing, or unconscionable conduct. Masholie v. River Edge Estates, Inc., 129 N.J. Eq. 228 (Ch. 1941), rehearing denied 135 N.J. Eq. 193 (Ch. 1944), affirmed 136 N.J. Eq. 118 (E. & A. 1945); 2 Thompson on Corporations (3d ed. 1927), § 1321, p. 782. *94 Instances of directors' self-dealing are always subject to the closest scrutiny by the court, particularly here where the votes of Gavlak and Capelli were necessary to constitute the majority which authorized the questioned action at the directors' meeting of March 31, 1953. The propriety of judicial supervision to prevent or redress fraudulent or inequitable conduct on the part of directors has never been questioned.
Gavlak and Capelli were directors not only of Callaghan but also of Peninsula, present owner of the gore. Under the circumstances here present defendant had the burden of showing that the transaction in question was entirely fair and not inimical to Callaghan or its stockholders. Masholie v. River Edge Estates, above, 129 N.J. Eq., at page 231; Solimine v. Hollander, 128 N.J. Eq. 228, 275-276 (Ch. 1940); 61 Harv. L. Rev. 335 (1948); 33 A.L.R.2d 1060; 114 A.L.R. 299. It has been said that this burden must be discharged by "clear and satisfactory proof," and that absent such proof the transaction under scrutiny cannot receive the commendation of a court of equity. Robotham v. Prudential Insurance Co., 64 N.J. Eq. 673, 712 (Ch. 1903).
There is plenary proof justifying the conclusion of the trial court that the two directors violated their fiduciary obligation to see to it that the Callaghan Company received legal title to the property it had contracted to purchase. Instead of acting in the interests of the company and all its stockholders, it is quite obvious that they decided it would be better from the standpoint of their individual interests to divert ownership of the gore from Callaghan to themselves and their associates, through the instrumentality of the hurriedly incorporated Peninsula company.
We conclude that plaintiffs' action was well founded, their case adequately proved, and the relief granted in the Chancery Division entirely justified. Its judgment is affirmed.