TREADWAY COMPANIES, INC.,
Plaintiff-Appellant,

v.

CARE CORPORATION, Robert W. Browne, Daniel Cowin and Philip deJourno, Defendants-Appellees.

CARE CORPORATION, Robert W. Browne and Philip deJourno, Counterclaim Plaintiffs-Appellees,

v.

FAIR LANES, INC., Treadway Companies, Inc., Daniel Parke Lieblich, John R. McDonnell, Simon Gluckman, Norman Brassler, Murray L. Cole, Samuel B. Dobrow and Bernard Mills, Counterclaim Defendants-Appellants.

CARE CORPORATION and Philip deJourno, suing derivatively in the right and for the benefit of Treadway Companies, Inc., Counterclaim Plaintiffs-Appellees,

v.

FAIR LANES, INC., Daniel Parke Lieblich, John R. McDonnell, Simon Gluckman, Norman Brassler, Murray L. Cole, Samuel B. Dobrow and Bernard Mills, Counterclaim Defendants-Appellants,

and

Treadway Companies, Inc., Nominal Counterclaim Defendant.

No. 1276, Docket 80–7335.

United States Court of Appeals, Second Circuit.

Argued May 29, 1980.

Decided Aug. 12, 1980.

Rehearing and Rehearing In Banc Denied Nov. 17, 1980.

Gerald J. Fields, New York City (Samuel R. Pierce, Jr., Raymond J. Soffientini, Richard S. Lawch, William Bruce Johnson, Battle, Fowler, Jaffin, Pierce & Kheel, New York City, on the brief), for appellants Treadway Companies, Inc., Daniel Parke Lieblich and Murray L. Cole.

Robert M. Blum, New York City (Thomas R. Berner, Jonathan J. Fink, Neil T. Rimsky, Robert A. Ladanyi, Danziger, Bangser, Klipstein, Goldsmith & Greenwald, New York City, on the brief), for appellants Norman Brassler, Simon Gluckman and John R. McDonnell.

Daniel S. Greenfeld, New York City (Stephen B. Camhi, Michael L. Hirschfeld, Joseph H. Adams, Marshall, Bratter, Greene, Allison & Tucker, New York City, on the brief), for appellees Care Corp., Robert W. Browne and Philip deJourno.

Michael H. Diamond, New York City (Douglas M. Kraus, Robert W. Wien, Skadden, Arps, Slate, Meagher & Flom, New York City, on the brief), for appellee Daniel Cowin.

Before FEINBERG, Chief Judge, and NEWMAN and KEARSE, Circuit Judges.

KEARSE, Circuit Judge:

Treadway Companies, Inc. ("Treadway") and five of its directors appeal from judgments of the United States District Court for the Southern District of New York, Gerald L. Goettel, *Judge*, entered in favor of Care Corporation ("Care"), two of its directors, and Daniel Cowin, in this action

arising out of a struggle for control of Treadway. The complaint, filed by Treadway after Care had acquired nearly 31% of Treadway's common stock, including a large block purchased from Cowin, alleged that Cowin had conspired with Care and others to seize control of Treadway by unlawful means. Treadway sought an order requiring Care to divest itself of its stock and requiring all defendants to account to Treadway for their profits. Care filed counterclaims seeking to enjoin the issuance and sale of 230,000 Treadway shares to a third company, Fair Lanes, Inc. ("Fair Lanes"), on the ground that Treadway's board had approved the sale for the improper purpose of perpetuating its control over the corporation. Care's motion for a preliminary injunction against this sale was denied and the sale was consummated.

After a bench trial of the claims and counterclaims, but while the case was still *sub judice*, Care waged a proxy fight with Treadway's incumbent management for the election of six of Treadway's eleven directors. Fair Lanes' 230,000 shares were voted in favor of management's nominees for the board, with the result that management's nominees were elected by a margin of 105,000 votes. Shortly thereafter, the district court issued its opinion, ruling in favor of Care and Cowin on all claims. The court ordered that the 230,000 votes cast by Fair Lanes not be counted toward the election of directors, and declared Care's nominees to be the new directors of Treadway.

Treadway filed this appeal, and on May 1, 1980, this Court stayed the judgment of the district court and ordered that the appeal proceed on an expedited schedule. We now affirm so much of the district court's judgment as held that Care and Cowin had not violated any duty to Treadway, but reverse the determination that the issuance of shares to Fair Lanes was improper.

## I. THE FACTS

The sequence of events is largely undisputed on this appeal. The principal factual controversies center on the purposes for which each side took certain actions, and the information possessed by each at the time the actions were taken.

Treadway is a New Jersey corporation engaged principally in the operation and management of bowling alleys and motor inns. Daniel Parke Lieblich is Treadway's chairman and president. Murray Cole is Treadway's Secretary, General Counsel and a member of its board of directors. John R. McDonnell, Simon Gluckman and Norman Brassler are directors of Treadway. Treadway and these five directors are the appellants here.[1]

Daniel Cowin is an investment banker who was a director of, and financial consultant to, Treadway from September 1974 until December 1978. By late 1977, Cowin had become Treadway's largest shareholder, controlling (in conjunction with his wife, and with a partner) 176,000 shares, or 14%, of the outstanding Treadway common stock.

Care is a Delaware corporation engaged in the operation of health care and recreational facilities, including bowling alleys. Robert W. Browne is Care's chairman. Philip deJourno was Care's president until April 1979, when he became Care's vice chairman. During a part of the time pertinent herein Browne and deJourno have also been directors of Treadway.

## A. Care meets Cowin, acquires a position in Treadway

In January 1978, Care had a large amount of cash on hand and started looking for ways to invest it. Browne asked Chauncey Leake, an investment banker and securities analyst, to prepare a study of companies, including Treadway, involved in the bowling industry. As it happened, Leake had known Cowin professionally for many years, and knew that Cowin was a

---

1. Samuel B. Dobrow and Bernard Mills, named as defendants on the counterclaims filed by Care, were also Treadway directors. Apparently Mills was never served and has made no appearance. Dobrow participated below, but is not a party to this appeal, a judgment having been entered in his favor. *See* note 32 *infra.*

director of Treadway. With Browne's approval, Leake contacted Cowin and told him about Browne and Care, and stated that Care was considering buying Treadway stock. Leake then arranged for Cowin to meet with Leake, Browne and John Bouwer, president of Care's bowling subsidiary, Concordia Corporation, on March 21, 1978.

At this meeting, Browne told Cowin, among other things, that Care had a "considerable amount" of cash on hand, and that it intended to buy a "reasonable amount" of Treadway stock. Browne asked for Cowin's opinion whether Care should continue to purchase stock on the open market or whether a tender offer would be "a more proper way to do it." Cowin responded (according to Browne's testimony at trial) that Care "could acquire a limited amount of stock . . . in a tender offer at a reasonable premium over the market, but that [Care] probably could acquire in the open market as well."[2]

At about this time, in late March 1978, Leake's brokerage firm started to buy Treadway stock for the account of Care. Initially, Leake bought in small amounts, and near the bid side, so as to avoid putting upward pressure on the price of the stock. Leake met again with Cowin in early April 1978, and once more discussed the purchases of Treadway stock. Also during the month of April, Bouwer visited most of Tread-

way's motor inns and bowling alleys, and wrote a detailed report on each.

During the early part of 1978, while Care was investigating Treadway and was beginning to acquire its stock, Treadway was actively considering the possibility of a spin-off of its unprofitable Inns Division. Treadway had Helmsley-Spear, Inc., prepare a report on the liquidation value of Treadway's motor inns. Cowin and Lieblich discussed this report with representatives of Helmsley-Spear; it was also discussed at Treadway's March 8, 1978, board of directors meeting. On April 7, 1978, Lieblich sent to all of Treadway's directors, including Cowin, a letter marked "Confidential" in which Lieblich stated that the liquidation value of the Inns Division greatly exceeded its going concern value, although its earnings were improving. On May 26, 1978, Treadway announced publicly that it was considering a spin-off of that division.[3] On June 6, Cowin met with Leake and discussed the likelihood that the spin-off would actually be carried out.

Care's ownership interest in Treadway soon approached 5% of the outstanding shares. When its holdings reached that point Care would be required to file a Schedule 13D with the Securities and Exchange Commission ("SEC") pursuant to § 13(d) of the Securities Exchange Act of 1934 ("1934 Act"),[4] stating, among other

2. Browne added:
 That was the only conversation, the only comments that were made regarding any kind of a tender offer with Mr. Cowin at that meeting. The conversation was academic.

3. It appears that Treadway had already announced, on April 26, that it was planning to divest itself of the Inns Division, although the structure of the proposed transaction described in the earlier announcement differed from that set forth in Treadway's May 26 press release.

4. Section 13(d), 15 U.S.C. § 78m(d) (1976), provides in relevant part as follows:
 (d)(1) Any person who, after acquiring directly or indirectly the beneficial ownership of any equity security of a class which is registered pursuant to section 78l of this title, or any equity security of an insurance company which would have been required to be so registered except for the exemption contained in section 78l(g)(2)(G) of this title, or

any equity security issued by a closedend investment company registered under the Investment Company Act of 1940, is directly or indirectly the beneficial owner of more than 5 per centum of such class shall, within ten days after such acquisition, send to the issuer of the security at its principal executive office, by registered or certified mail, send to each exchange where the security is traded, and file with the Commission, a statement containing such of the following information, and such additional information, as the Commission may by rules and regulations, prescribe as necessary or appropriate in the public interest or for the protection of investors—
 (A) the background, and identity, residence, and citizenship of, and the nature of such beneficial ownership by, such person and all other persons by whom or on whose behalf the purchases have been or are to be effected;

things, its purpose in acquiring Treadway stock. On June 30, 1978, at Leake's suggestion, Browne met with Lieblich to introduce himself and to explain, prior to the filing, Care's intentions regarding Treadway. Browne told Lieblich that Care had bought the stock for investment purposes only. Lieblich asked whether Browne was interested in becoming a Treadway director, but Browne said that he was not. Lieblich also raised the possibilities of a Care-Treadway merger and of a sale to Treadway of Care's bowling interests. Browne responded that Care was not interested. No mention was made, at this meeting, of Care's prior contacts with Cowin. On July 17, 1978, Care filed its Schedule 13D with the SEC, reporting that Care then owned 7.16% of Treadway's common stock, and stating that Care's current purpose in obtaining the stock was as an investment.

### B. *Cowin sells his Treadway stock to Care*

Late in the summer of 1978, Cowin began to consider selling his Treadway stock. He discussed the possibility of such a sale with his lawyer, Fred Gerard, but took no fur-

ther steps toward carrying it out. Cowin did not inform Treadway that he was considering selling. Indeed, at the Treadway board meeting of August 24, 1978, in a discussion of an application for a tax ruling on the Inns Division spin-off, Cowin stated that he had no present intention of selling his shares.[5]

On September 11, 1978, in response to an invitation extended by Browne at their first meeting on March 21, Cowin went to Grand Rapids, Michigan with Leake to visit Care's headquarters. Cowin informed Lieblich of the trip before he left. Lieblich was quite upset to have been excluded from what he assumed were conversations about Treadway, and telephoned immediately upon Cowin's return to ask about the trip. Cowin reported that Care's purchases of Treadway stock had been for investment purposes only, and that Care was satisfied with Treadway's current management. At trial, those who had attended the Grand Rapids meeting testified that the only Treadway matter discussed at any length was the proposed Inns Division spin-off.

(B) the source and amount of the funds or other consideration used or to be used in making the purchases, and if any part of the purchase price is represented or is to be represented by funds or other consideration borrowed or otherwise obtained for the purpose of acquiring, holding, or trading such security, a description of the transaction and the names of the parties thereto, except that where a source of funds is a loan made in the ordinary course of business by a bank, as defined in section 78c(a)(6) of this title, if the person filing such statement so requests, the name of the bank shall not be made available to the public;

(C) if the purpose of the purchases or prospective purchases is to acquire control of the business of the issuer of the securities, any plan or proposals which such persons may have to liquidate such issuer, to sell its assets to or merge it with any other persons, or to make any other major change in its business or corporate structure;

(D) the number of shares of such security which are beneficially owned, and the number of shares concerning which there is a right to acquire, directly or indirectly, by (i) such person, and (ii) by each associate of such person, giving the background, identity, residence, and citizenship of each such associate; and

(E) information as to any contracts, arrangements, or understandings with any person with respect to any securities of the issuer, including but not limited to transfer of any of the securities, joint ventures, loan or option arrangements, puts or calls, guaranties of loans, guaranties against loss or guaranties of profits, division of losses or profits, or the giving or withholding of proxies, naming the persons with whom such contracts, arrangements, or understandings have been entered into, and giving the details thereof.

(2) If any material change occurs in the facts set forth in the statements to the issuer and the exchange, and in the statement filed with the Commission, an amendment shall be transmitted to the issuer and the exchange and shall be filed with the Commission, in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

5. Counsel to Treadway had advised the directors that in order for the proposed spin-off to receive favorable tax treatment, the directors would have to represent that they had no present intention of selling their Treadway stock.

In October, Cowin decided to sell virtually all of his Treadway stock. He called Leake and said that he had 175,000 shares for sale. Leake relayed this information to Browne, who expressed interest. Leake then met with Cowin, who stated that he would sell at $9 per share, if paid over a period of time, or at some lower price if paid in cash.

Cowin did not inform Treadway of these discussions with Care. However, at approximately the same time, in mid-October, Cowin was asked, in connection with the proposed Inns Division spin-off, to sign a letter stating that he had no present intention of selling his shares. Cowin refused to sign the letter. Lieblich, believing that Cowin's refusal jeopardized the proposed spin-off, met with Cowin on October 18 to discuss the situation. Lieblich told Cowin that if he was unhappy with Treadway's management and wished to sell his stock, he should consider selling his shares back to the corporation. Cowin replied that he did not think Treadway could afford such a purchase and that it might be legally questionable for a director, who was also the largest stockholder, to make such a sale.[6] Cowin did not reveal that he had already discussed a sale with Care. The meeting ended without the parties having resolved their differences.

Cowin attended meetings with all of the Treadway directors on October 25 and 26. On these occasions, as before, he remained silent on the fact that he was negotiating the sale of his stock to Care. However, he did state that he no longer favored the Inns Division spin-off, as he thought it was no longer a sound economic proposition. The Treadway board eventually determined that the proposed spin-off was not in the best interests of the corporation, and decided not to carry it out. At the formal board meeting on October 26, Cowin was renominated as a director.

The Cowin-Care stock sale was closed on November 9, 1978. Retaining 1,000 shares,

Cowin sold 175,000 shares (including the shares held by his wife and by his partner) at $9 per share, to be paid over the next three years. The district court calculated the present value of the price to Cowin to be $8 per share, representing a premium of 35% over the then market price of the stock of $5⅞.

On the following day, November 10, Cowin called Lieblich and informed him of the sale. Lieblich was displeased, and determined to seek Cowin's removal from the Treadway board. After consulting with the other directors, Lieblich called Browne and asked if he would be willing to fill the prospective vacancy. Browne replied that he wanted Cowin to remain on the Board. Lieblich continued to press for Cowin's ouster, and at a special meeting of the board on December 19, Cowin finally consented to withdraw as a nominee in the impending election. The next day Lieblich formally invited Browne to become a nominee. Browne declined, on the ground that he was too busy, but suggested that deJourno be considered. At the annual meeting held later that day, deJourno was elected a director of Treadway.

Meanwhile, on November 14, Care had filed its fourth amendment to its Schedule 13D, setting forth the details of the purchase from Cowin and stating that Care then owned 24.21% of Treadway's stock. By the end of November, Care's ownership interest had risen to 26%. At a luncheon meeting with Browne and Bouwer on December 19, Lieblich asked whether Care was moving toward a takeover attempt. Browne answered in the negative, saying "I don't even know what a takeover situation is." He reiterated that Care's purchases of Treadway stock had been solely for purposes of investment, and that Care had bought Cowin's block so that Care could start equity accounting. As will be discussed in greater detail below, however, the district court found that by the time it purchased Cowin's stock in November 1978,

---

**6.** The district court found that Treadway, which at that time had about a $2 million deficit in working capital (excess of current liabilities over current assets), was not well situated to purchase Cowin's stock.

Care had already determined to seek control of Treadway.

### C. *Care and Treadway gird for battle*

On February 14, 1979, Care filed the fifth amendment to its Schedule 13D, announcing that it intended to seek two more representatives on Treadway's board, and that over the longer range, it was considering five possible alternative courses of action with regard to its stake in Treadway. These alternatives included Care's seeking still more representatives on Treadway's board; a merger or other business combination between Treadway and Care, or between Treadway and Concordia; and Care's seeking control of Treadway either by continued purchases of outstanding Treadway stock, or by a purchase from Treadway of unissued or treasury stock. Care asserted that it had not yet decided whether or not to pursue any of these alternatives. At the time of this filing, Care owned 26.1% of Treadway's common stock.

On the same day, Browne wrote to Lieblich requesting that he and Bouwer be elected to Treadway's board. Lieblich learned of the letter and the new 13D amendment while he was in Florida where a Treadway directors' meeting was to be held on February 23. Concerned about the possibility of a takeover attempt, Lieblich immediately telephoned William Sword ("Sword") of William Sword & Co., Inc. ("Swordco"), to inquire whether Sword was available to act as Treadway's investment banker. Sword stated that he was available. Lieblich discussed the situation at a luncheon on February 22 with several of the directors.[7] Later that day, Lieblich met with Browne, and after some discussion it was agreed that Care would have one additional representative, Browne, on the Treadway board. Then Lieblich brought up the recent Schedule 13D amendment, and said that Treadway's board was willing to discuss a merger. Browne replied that Care was not interested in merging with or taking over Treadway, and that Care's holdings in Treadway were for investment purposes only; he said that the alternatives set forth in the Schedule 13D amendment were simply attorneys' "boilerplate." On February 23, Treadway's board met and elected Browne a director. At the board meeting Browne reiterated that Care held its Treadway stock solely as an investment.[8]

Lieblich apparently disbelieved Browne's assurances about Care's intentions. He went to talk to Sword in March or April 1979, and in June Swordco was formally retained as Treadway's investment bankers by the Treadway board of directors. The board instructed Swordco to investigate Care and Treadway, and to look for other candidates for a possible business combination with Treadway. Prior to the board meeting, Lieblich had told Sword that in his view, a merger with Care would not be in the best interests of Treadway's shareholders.

While Treadway was enlisting the assistance of Swordco, Care continued to consult with Leake, Cowin and Gerard. On June 21, Browne met with Cowin and Leake in New York; among the topics discussed was the possibility of a tender offer by Care for Treadway stock. On June 29, Care resumed its open market purchases, buying stock in relatively small amounts. Around this time, Browne, deJourno and Bouwer met with Gerard to discuss the Care-Treadway situation; Browne and deJourno continued to consult Gerard throughout the summer; Gerard also met with Leake. By late summer Care began to consider putting together a complete slate of nominees for the Treadway board. A list of potential candidates was prepared; included on the list were Browne, Cowin, Leake, Gerard and Cowin's real estate partner David Schuldiner.

7. Apparently all but three directors attended. One was on vacation, and Dobrow was asked to play golf with deJourno.

8. At this meeting the board considered whether to take any action against Cowin with respect to his sale of stock. Both Care and Cowin provided outside legal opinions as to the propriety of the sale, and the board took no action at that time.

At the Treadway board of directors meeting on August 23, 1979, Sword presented a report detailing Care's purchases of Treadway stock, and stated the view that a Treadway-Care combination would not be in Treadway's best interests. Apparently Sword did not report on any other potential merger candidates, although he did present an analysis of a proposed acquisition of Fair Lanes by Penn Central Corporation.

### D. *Treadway files suit and lines up a "white knight"*

According to Lieblich's testimony, at the August 23 board meeting Sword asked Browne whether Care had purchased any Treadway stock since December 1978, and Browne replied that it had not. By the end of August, however, Lieblich had received Care's sixth Schedule 13D amendment, dated August 24, 1979, reflecting purchases totaling nearly 13,000 shares between July 2 and August 16.[9] The amendment revealed that Care now held 27.1% of Treadway's stock. On September 4, Lieblich telephoned Sidney Friedberg, chairman of the board of directors of Fair Lanes. Lieblich explained that Treadway was exploring ways of staving off a takeover by Care, and asked whether Fair Lanes, in light of its own negotiations with Penn Central, would object if Treadway contacted Penn Central to explore the possibility of a Penn Central-Treadway combination. Friedberg request-

ed that Lieblich not contact Penn Central for six weeks, and promised to communicate further with Lieblich after that time.

Care continued to accumulate Treadway stock during the month of September and its interest gradually approached one-third of the outstanding shares, at which point Care would be able, under New Jersey law, to block any proposed merger or consolidation.[10] On September 11, Treadway's board retained special counsel to represent Treadway with regard to the Care situation. Two weeks later, on September 25, Treadway filed its complaint in this action, naming Care, Browne, deJourno and Cowin as defendants, and alleging violations of various sections of the 1934 Act and breaches of fiduciary duties under New Jersey law in connection with Cowin's sale of stock to Care, as well as a claimed misuse of confidential information.[11] The complaint requested that Care be ordered to divest itself of all Treadway stock, and that Treadway be awarded all profits obtained by the defendants from the activities complained of. Treadway also moved for a preliminary injunction enjoining Care from acquiring further Treadway stock, from soliciting proxies of other Treadway shareholders, and from voting the shares which it already owned. The district court, finding that Treadway had not demonstrated either likelihood of success on the merits or irreparable injury if injunctive relief were not granted, denied

---

9. The denial said to have been made by Browne at the August 23 meeting would thus have been false. Browne, however, testified that he made no such denial. The district court made no finding on this point.

10. N.J.Stat.Ann. § 14A:10–3(2) (West 1969) provides, in pertinent part, that
in the case of a corporation organized prior to the effective date of this act, the plan of merger or consolidation shall be approved upon receiving affirmative vote of two-thirds of the votes so cast.
Treadway was organized prior to January 1, 1969, the effective date of the act. N.J.Stat. Ann. § 14A:16–4 (West 1969).

11. In counts I through III, respectively, all defendants were charged with violations of §§ 13(d), 16(a), and 10(b) of the 1934 Act, 15 U.S.C. §§ 78m(d), 78p(a), and 78j(b) (1976).

(Treadway subsequently withdrew count II, containing § 16(a) claim.) Counts IV through VI alleged that all defendants had breached their fiduciary duties to Treadway, in violation of N.J.Stat.Ann. § 14A:6–14 (West 1969), and the New Jersey common law, by misappropriating confidential and propriety information about Treadway for their own purposes, by failing to preserve the confidentiality of information about Treadway, and by failing to advise Treadway of Care's actions in seeking to take control of Treadway. Counts VII and VIII charged Cowin alone with breach of fiduciary duty, in that (i) Cowin had refused, in connection with the Inns Division spin-off, to sign a letter representing that he had no plans to sell his Treadway stock; and (ii) Cowin had not offered his Treadway shares to Treadway before selling to Care.

Treadway's motion in an opinion dated October 12.[12]

In early October, Lieblich called Friedberg again to inquire about Penn Central. Shortly thereafter, Fair Lanes' own discussions with Penn Central apparently having ended, Friedberg telephoned Lieblich to raise the possibility of a combination between Treadway and Fair Lanes. Lieblich subsequently met with members of Fair Lanes' management in Baltimore on October 19. At this meeting, the Fair Lanes side expressed interest in a merger, but noted that Care would soon be able to block the needed shareholder approval. One Fair Lanes representative pointed out that if Fair Lanes acquired a large block of Treadway's authorized but unissued stock, it would offset Care's interest, thereby precluding Care from blocking a merger, while also permitting Fair Lanes to influence the election of Treadway directors. Fair Lanes subsequently determined that from its point of view such a purchase was a necessary first step in its dealings with Treadway.

At about the time that he began discussions with Fair Lanes, Lieblich also instructed Swordco to concentrate its efforts on a Fair Lanes-Treadway combination. Consequently, when soon thereafter Penn Central contacted Swordco about opening merger discussions with Treadway, Swordco did not seriously pursue the overture.

Treadway's board met on October 25. Gluckman offered a resolution nominating himself, Samuel Dobrow, Lieblich and Browne for reelection at the next annual shareholders' meeting, scheduled in accordance with Treadway's bylaws to be held on December 20, 1979. Browne proposed an amended slate of nominees, consisting of Browne, Leake, Bouwer and Victor Leslie, a director of Concordia. Browne's amendment was defeated and the resolution nominating the incumbent directors was approved. No mention was made, at this meeting, of Lieblich's discussions with Fair Lanes.

On October 29, Lieblich, Sword and other Treadway representatives met with Fair Lanes' management in Baltimore. Walter Hall, Fair Lanes' chief financial officer, broadly outlined the merger terms which Fair Lanes would seek from Treadway. Under Hall's proposal, Fair Lanes would transfer its bowling assets to Treadway (while retaining other substantial assets),[13] in exchange for shares of Treadway common stock, with the result that Fair Lanes would then hold more than 80% of Treadway's outstanding stock. The parties agreed that the first step in the negotiations would be the sale to Fair Lanes, for cash, of a large block of Treadway stock, in order to neutralize the ability of Care to obstruct the proposed merger. Sword proposed that Fair Lanes purchase 240,000 authorized but unissued shares (equal to 19.4% of the Treadway shares then outstanding) at $6.75 or $7.00 per share. Friedberg proposed that Fair Lanes pay $6.00 or $6.25 per share. This number of shares was close to the maximum that could be issued and listed without obtaining approval of the shareholders under American Stock Exchange (Amex) guidelines.[14]

On November 2, Care filed its ninth amendment to its Schedule 13D, announcing that it intended to present its own slate of nominees for election to the Treadway board and to seek proxies in favor of their election at the annual shareholders' meeting. Two days later, on November 4, Lieblich and his advisers reached agreement with Fair Lanes on the terms of sale of the 240,000 shares. The price was set at $6.50 per share (the closing market price on the last previous day of trading), and Fair Lanes obtained the right, for a one month period commencing five months after the

---

12. *Treadway Companies, Inc. v. Care Corp.*, [1979-1980 Transfer Binder] Fed.Sec.L.Rep. (CCH) ⁋ 97,139 (S.D.N.Y.1979).

13. Hall testified that Fair Lanes' bowling operations accounted for approximately 90% of the company's profits, with the other assets (which Fair Lanes would retain under its merger proposal) accounting for only 10%.

14. Treadway's common stock was listed on the Amex and Treadway was thus subject to Amex guidelines.

sale, to "put" or resell the shares to Treadway.[15] A day or two later, however, before the proposal had been presented to the Treadway board,[16] Amex indicated that in light of the "put" feature, it would not regard favorably an application to list the shares unless Treadway obtained shareholder approval of the sale. Fair Lanes and Lieblich promptly abandoned this proposal and began work on a restructured deal.

Between the time of the public announcement of the first proposed sale (which was the first inkling that Browne and deJourno had of it) and the public announcement of its abandonment, Care sought a preliminary injunction against the sale of the 240,000 shares to Fair Lanes. The district court denied the motion as premature, noting that Treadway's board had not yet approved any transaction. On November 9, Care, Browne and deJourno filed counterclaims, naming as defendants Fair Lanes,[17] Treadway, and Treadway directors Lieblich, McDonnell, Gluckman, Brassler, Cole, Dobrow and Mills. The counterclaims sought a permanent injunction against the sale to Fair Lanes, on the grounds that Treadway and the named directors had breached their fiduciary duties under New Jersey law and had violated § 10(b) of the 1934 Act and § 720 of the New York Business Corporation Law.

On the same day, Lieblich and Fair Lanes reached general agreement that Fair Lanes would purchase 65,000 shares of Treadway treasury stock and 200,000 shares of a newly created Series A Cumulative Voting Preferred Stock at a price of $6.50 per share. The new proposed agreement required Treadway to redeem the preferred stock on September 30, 1980, and provided that if Treadway defaulted on the redemption, Fair Lanes would be entitled to name a majority of directors to the Treadway board. The agreement also required Treadway's management to recommend to its board of directors, within thirty days of the sale, a business combination with Fair Lanes on terms acceptable to Fair lanes. The parties contemplated carrying out this agreement without obtaining approval from Treadway's shareholders.

A special meeting of the Treadway board was held on November 13, principally to consider this new proposed agreement.[18] First, however, Lieblich reported that Care's most recent 13D amendment stated its intention to take over the management of Treadway. After some discussion, the board resolved, with Browne and deJourno in opposition, that a takeover by Care would not be in the best interests of Treadway's shareholders. The discussion then turned to Fair Lanes, and the directors were informed of the negotiations concerning the proposed stock sale. Sword reported that his company had investigated Fair Lanes and had concluded that Treadway should explore the possibility of a merger with that company.[19] It was reported that

---

15. Fair Lanes appears to have sought a "put" as a compromise in order not to have an unsalable block of Treadway stock on its hands should the proposed merger be blocked. Initially Fair Lanes made it clear that it wanted no restrictions on its ability to sell the stock to anyone, including Care which obviously would have been the most likely prospective purchaser for a large block of stock. Treadway's management made it equally clear that they did not want Fair Lanes to sell to Care. The concerns of both sides were alleviated by forbidding Fair Lanes to sell to Care and giving Fair Lanes the one-month "put" option.

16. Lieblich testified that between the October 29 meeting with Fair Lanes and November 4, he "probably touched bases with some [Treadway] directors, excluding Dr. Browne, Mr. deJourno."

17. Fair Lanes was never served and has not appeared.

18. A regular meeting of the board had been scheduled for November 15. The November 13 meeting was called by telegram on three days' notice, the minimum allowed under Treadway's by-laws. Browne happened upon the telegram at his office on Saturday, November 10.

19. The minutes of this Treadway board meeting recite that Sword told the board that "there are merger partners for this Company, including Fair Lanes, and that at this time Fair Lanes is particularly well suited to be considered for merger, and such merger could be in the best interest of the shareholders if accomplished."

final agreement had not been reached as to either the proposed stock sale or a merger. Browne and deJourno asked a number of questions about the Fair Lanes negotiations, but Lieblich declined to answer most of them. Browne then threatened to sue the directors, and to seek to hold them personally liable, if they took any further action with respect to Fair Lanes. Treadway's outside counsel advised the directors that they could properly, and without incurring personal liability, resist a takeover which they had determined was not in the shareholders' best interest. The directors then resolved to explore the desirability of a merger with Fair Lanes, and, in connection with the exploration of the desirability of such a merger, authorized management to proceed with the sale of treasury and preferred stock, at a price of not less than $6.50 per share, on condition that Swordco would provide an opinion that the transaction was "fair and reasonable" to Treadway's shareholders.

On November 15, Care renewed its application for a preliminary injunction, and the district court issued a temporary restraining order enjoining the voting at the next annual meeting of any preferred stock issued to Fair Lanes. Also on November 15, Care filed amended counterclaims, challenging the second proposed sale to Fair Lanes on the same grounds which had earlier been asserted against the first proposed transaction. Treadway's board formally approved the new agreement on November 17, and it was signed on November 19. As signed, the agreement was expressly conditioned on the district court's vacating its temporary restraining order against the voting of the preferred shares. In an opinion dated November 27, however, that court entered a preliminary injunction against the sale of any preferred stock which could, despite the mandatory redemption feature, be voted at the next annual meeting.[20]

In light of the injunction, Fair Lanes and Treadway decided not to proceed with the second proposed deal. Instead, Lieblich instructed Swordco to begin structuring a new transaction in which Fair Lanes could purchase a block of Treadway stock with full voting rights. At this point Lieblich also determined to delay the annual shareholders' meeting until a stock sale to Fair Lanes could be consummated.[21] At about the same time, on November 28, Treadway and Fair Lanes commenced negotiations as to the terms for a merger, with discussion centering on the basic proposal advanced by Fair Lanes at the October 29 meeting. The parties realized that they might not be able to merge right away. New Jersey law requires that a merger be approved by two-thirds of the stock that is voted; thus, even with the sale to Fair Lanes diluting Care's percentage ownership to less than one-third, Care's resultant 28% might suffice to block the necessary two-thirds approval. However, Fair Lanes proceeded on the premise that its acquisition of a block of Treadway stock could defeat Care's slate of nominees in the next election of directors, and thus create a stalemate. Fair Lanes hoped that Care would then consider its situation unacceptable, and would withdraw from the field, allowing Fair Lanes to consummate the merger with Treadway.

As for the stock sale, the parties soon developed a new proposal under which Fair Lanes would buy 230,000 shares of Treadway common stock, consisting of 67,000 shares of treasury stock and 163,000 authorized but unissued shares. This proposed agreement had neither a "put" option nor a mandatory redemption feature, but gave Fair Lanes the right to rescind the transaction if for any reason (including a court order) it were prevented from voting the shares either in the coming election of directors or in the shareholders' vote on the proposed Fair Lanes-Treadway merger. The agreement also gave Treadway a right of first refusal with respect to any sale of the shares by Fair Lanes, gave Fair Lanes

---

**20.** *Treadway Companies, Inc. v. Care Corp.,* [1979 1980 Transfer Binder] Fed.Sec.L.Rep. (CCH) ⸗ 97,188 (S.D.N.Y.1979).

**21.** Care eventually obtained an order from a New Jersey state court, setting the shareholders' meeting for March 20, 1980.

the exclusive right for 120 days to negotiate a business combination with Treadway, and provided that three Fair Lanes representatives would be added to Treadway's slate of nominees for election as directors.[22]

Treadway's board met again on December 20. The board first received reports from Lieblich and Swordco on the negotiations with Fair Lanes. Browne and deJourno were given copies of a report by Swordco (which the other directors had received at a rump meeting the night before) outlining the details of the stock sale and business combination proposals. This report, described by Swordco as a "working document" rather than a final study, included the proposed number of shares to be issued for the business combination, the proposal that only the bowling assets of Fair Lanes would be acquired, pro forma income statements, and Swordco comments on the effects of the transaction. A Swordco representative stated that agreement had not been reached as to the precise number of shares to be issued in exchange for the Fair Lanes assets,[23] or as to whether all of the assets were to be transferred. He stated that his firm would provide a written opinion to the effect that the terms of the proposed sale and the proposed combination were fair to Treadway. Gluckman asked for a pro forma balance sheet in order to make a decision. Lieblich explained that the proceeds of the sale would be used principally to pay off a bank loan, and noted that the sale would dilute the holdings of current shareholders and would thus cause, as an immediate effect, a slight decrease in Treadway's earnings per share. Then, with Browne and deJourno voting against, and Dobrow abstaining pending further consideration, the board authorized management to execute the sale agreement and to sell the 230,000 shares of common stock to Fair Lanes for $6.50 per share. The board also resolved that subject to consummation of the stock sale agreement, the number of directors would be increased from nine to eleven, and three Fair Lanes nominees would be included in (and Browne dropped from) the slate of nominees recommended for election at the next annual meeting. According to the minutes, decision on the business terms of the possible combination with Fair Lanes was postponed for one week "in order to permit the Board an additional opportunity to consider the recommendations of Wm. Sword & Co. Incorporated and to evaluate for themselves the advantages and/or disadvantages of the possible business combination with Fair Lanes."

On December 27, the board reconvened, minus Gluckman who was absent,[24] and without Dobrow, who on December 26 had resigned by telegram for health reasons.[25] Sword distributed a new report as to the details of the stock sale and merger proposals as finally negotiated, and a Swordco opinion letter addressing the fairness of the two transactions. In the subsequent discussion, the Swordco representatives outlined what they considered to be the advantages

---

**22.** Treadway's board was to be increased from nine to eleven directors to facilitate this.

**23.** Shortly before, it had been discovered that Fair Lanes' proposal assumed that 5,084,024 shares would be issued to Fair Lanes *in addition* to the 230,000 to be sold, whereas Treadway assumed that Fair Lanes' *total* holding after the combination would be 5,084,024 shares. The difference had not been resolved by December 20. By December 27, Fair Lanes accepted Treadway's position.

**24.** Gluckman sent a telegram regretting his absence from the board meeting and stating that as a shareholder he would vote his shares in favor of a business combination with Fair Lanes.

**25.** Dobrow's telegram read as follows:

I HEREBY TENDER MY RESIGNATION AS A MEMBER OF THE BOARD OF DIRECTORS OF TREADWAY CO INC. IT IS WITH DEEP REGRET THAT I FIND THAT I MUST DO SO FOR HEALTH REASONS. YOU KNOW THAT I HAD OPEN HEART SURGERY A FEW YEARS AGO AND I MUST NOT BE SUBJECTED TO STRESS, SUCH AS I HAVE EXPERIENCED WITH THE OBVIOUS TENSIONS AT THE MEETINGS, DR. BROWN'S [*sic*] SERIOUS THREATS AND THE NOW VERY FREQUENT TRAVEL. PLEASE BE INFORMED THAT I AM IN FAVOR OF THE MERGER WITH FAIR LANES AND I SHALL VOTE MY STOCK IN FAVOR OF THE MERGER.

to Treadway of a merger with Fair Lanes.[26] The board then passed a resolution reaffirming its earlier approval of the stock sale and approving management's recommendation as to the basic terms of the proposed business combination. Management was authorized to proceed toward a definitive agreement with Fair Lanes as to the merger.

The stock sale agreement was quickly executed, and 230,000 shares of Treadway stock were issued to Fair Lanes on December 28. Care's interest in Treadway was thereby reduced from 34% to 28%. On January 2, 1980, the district court heard Care's motion for a preliminary injunction against consummation of this sale.[27] Because of the imminence of trial, and the district court's view that the critical question was whether Fair Lanes' shares could be voted in the election of directors scheduled for March 20, the court declined to issue the injunction. On January 16, Care filed sup-plemental counterclaims alleging with respect to the stock sale just consummated the same claims which it had asserted against the earlier, aborted deals.

### E. The proxy contest and the opinions below

On January 18, 1980 the district court handed down an opinion disposing of a motion, filed by Care and Cowin on October 30, 1979, to dismiss Treadway's complaint.[28] The court dismissed all of the 1934 Act claims that had not already been withdrawn by Treadway. As to Treadway's § 13(d) claim, the court ruled that any violations by Care had been cured by subsequent filings or were de minimis; as to the § 10(b) claim, the court ruled that Treadway did not have standing to complain of purchases made by Care from Treadway shareholders.[29] A bench trial of the state law claims asserted by Treadway and the counterclaims assert-

26. The district court made a number of findings relating to the merits of the proposed merger; on the basis of these findings the court concluded that Swordco had overstated the advantages of the proposal, and that Treadway (or at least Lieblich) had not given serious consideration to other aspects of the deal that would disadvantage Treadway.

The first purported advantage was that Treadway shareholders would realize a "premium" on their shares. At the December 20 meeting, Swordco pointed out that since the post-merger allocation of shares had been calculated on a share-for-share exchange basis, and since the market price of Fair Lanes stock was higher than that of Treadway stock, Treadway shareholders would in effect realize a "premium" in the merger. As the district court noted, however, by December 27 the relative prices had shifted so that the "premium" was eliminated. (The court appears to have ignored the possibility that between December 20 and December 27 the market price of each stock may have been affected by the proposed agreement.)

The second purported advantage was that the combined entity would have greater depth of management. The court rejected this argument, noting that Lieblich was the only member of Treadway's management given a specific commitment as to future employment, and that in fact, "it was hardly anticipated that any combination of management would take place." 490 F.Supp. 668, at 681. (The court appears to have rejected the possibility that even a one-for-one replacement of Treadway executives by Fair Lanes' executives might give Treadway greater depth of management.) Finally, the court dismissed the third purported advantage—efficiencies of operation and savings on various administrative and corporate costs—as "more illusory than real." (Id.)

Principal among the disadvantages that the district court focused on was the fact Fair Lanes proposed to exclude from the exchange certain non-bowling assets. The court found that when Lieblich originally agreed to the principle of a share-for-share exchange, he believed that all of Fair Lanes' assets were to be included. Lieblich subsequently acquiesced in the exclusion, "despite the fact that he never received a complete analysis of the value of the excluded assets." Id. at 680.

27. This motion had been filed on or about December 20, 1979, but the district court had declined to hear it at that time on the ground that it was premature inasmuch as the Treadway board had not yet approved the deal.

28. Treadway Companies, Inc. v. Care Corp., 490 F.Supp. 660 (S.D.N.Y.1980).

29. The court also dismissed Count VII of Treadway's complaint which charged Cowin, in essence, with having sabotaged the Inns Division spin-off for improper purposes. The court ruled that since Treadway's board had eventually determined to abandon the spin-off because it was not in Treadway's best interest, any obstruction of the spin-off by Cowin could not have harmed Treadway or its shareholders.

ed by Care was held between January 21 and February 6, following which the court reserved decision.

In late February, while these claims and counterclaims were *sub judice*, Treadway and Care began to solicit proxies for the election of directors to take place at Treadway's annual meeting on March 20. On March 3, the district court issued "tentative findings of fact" to assist the parties in preparing their proposed conclusions of law. These included findings that Care had already determined to seek control of Treadway in November 1978, when it purchased Cowin's stock, but that Care continued to represent over the next eleven months, in its SEC filings and in direct contacts with Treadway's management and board, that its only purpose in acquiring Treadway stock was investment; that Lieblich had decided in February 1979 to oppose a Care takeover in order to preserve his position with Treadway; and that Lieblich had originally believed that all of Fair Lanes' assets would be included in the proposed merger, but continued to support the merger on essentially the same price terms after learning of the exclusions, even though he never received a complete analysis of the value of the excluded assets. The court initially ordered that the parties not disclose any of the tentative findings. At Care's request, however, the court subsequently modified its order to permit the parties to disclose findings "adverse" to them, but not to make any "affirmative" use of the findings. Care then sent a letter to Treadway's shareholders, dated March 7, containing a section entitled "Supplemental Proxy Information." In this section Care purported to describe the district court's tentative finding on the question of when Care decided to seek control of Treadway; the letter went on to explain why Care thought this finding was incorrect. Treadway apparently considered that the district court's prohibition of "affirmative" use of the tentative findings barred it from responding to this new matter.

On March 18 the district court notified the parties that it would not render its decision before the annual shareholders'

meeting, and requested that the inspectors of election segregate the votes of the 175,000 shares that Care had purchased from Cowin and the 230,000 shares held by Fair Lanes. The annual meeting was held as scheduled on March 20. Treadway's nominees won the election by approximately 105,000 votes, giving effect to all votes cast. The results were certified by the inspectors of election and forwarded to the district court, pursuant to its instructions.

The district court issued its opinion on April 16. As to Treadway's claims against Cowin, the court found that Cowin had not breached any duty to Treadway in selling his shares to Care, had not disclosed any confidential or proprietary information to Care in the period leading up to that sale, and had not deprived Treadway of any corporate opportunity by failing to offer his shares for sale to the corporation, because Treadway would not have been able to purchase them. The court concluded:

> While this Court finds that Cowin's behavior in failing to advise Treadway management of his continuing contacts with Care, and in seeking and accepting renomination to the Treadway board while negotiating the sale of his stock, constituted a betrayal of the trust placed in him by incumbent management, he did not breach any fiduciary duty owed to the shareholders or to the corporation.

490 F.Supp. at 683.

Turning to Treadway's claims against Care, Browne and deJourno, the court first found that Care's representations that it purchased Cowin's stock purely for investment were not credible. The court found that at least by this time, November 9, 1978, Care had determined to seek control of Treadway. The evidence relied on to support this conclusion included the very size of Care's stake in Treadway at that point, the fact that the acquisition of Cowin's shares was followed by a number of discussions between or among Browne, Cowin, Gerard, Bouwer and Leake about the possibility of a tender offer for Tread-

way,[30] and certain suggestive passages in Care documents.[31]

Nevertheless, the court concluded that Care's misrepresentations as to its intentions in purchasing Treadway stock had not influenced Treadway's board in its decision to offer directorships to deJourno and Browne. The court then determined that Browne and deJourno had not breached any of their duties as Treadway directors by participating in Care's efforts to seize control of Treadway. Noting that as directors, Browne and deJourno "were obligated to act in good faith towards, and for the best interests of," Treadway, the court concluded that

> [b]oth Browne and deJourno have so acted. No evidence was presented at trial to indicate that either director misused any confidential or proprietary information. Nor is there any reason to believe that their knowledge and support of Care's intent to acquire control of Treadway was in any way adverse to the best interests of the shareholders, as opposed to the incumbent management, of Treadway. Based upon the evidence presented at trial, the Court concludes that neither Treadway nor its shareholders suffered any damages as a result of either Browne or deJourno being a director.

*Id.* at 684. Having determined that Care's ownership of Treadway stock was not the result of any breach of duty by the individual defendants, the court held that Treadway was not entitled to an order requiring Care to divest, or enjoining it from voting, its shares.

The court next addressed Care's counterclaim charging that Treadway's directors had acted for improper purposes in entering into the stock sale to Fair Lanes, and had thereby wasted corporate assets. The court started with two basic premises: that the management of a corporation "has the duty to oppose a takeover attempt which it, in good faith, has determined to be detrimental to the best interests of the corporation or its shareholders"; but that management may not use its powers simply "as a means to protect itself from what it views as a hostile takeover bid." *Id.* at 684–685. Thus, the court reasoned, while the board of directors is empowered to sell treasury or authorized but unissued stock, the board may not, "by pretending to oppose an allegedly unfavorable takeover attempt, utilize this power to manipulate the issuance and sale of stock for the sole or primary purpose of perpetuating its control over the corporation." *Id.* at 685.

The court concluded "that the primary purpose for Treadway in entering into the sale was to thwart a Care takeover," *id.* at 686, and that both the sale and the proposed combination were "the culmination of a plan of action intended to prevent Care from taking control of the corporation." *Id.* at 681. To determine whether Treadway's directors had been motivated principally by their desire to perpetuate their own control, the court undertook to "examine both the manner in which the sale agreement was entered into and negotiated and the ostensible justification for the sale itself." *Id.* at 685.

**30.** Such conversations took place in December 1978 and January 1979. A letter from Browne to Cowin, dated January 5, 1979, stated Browne's desire "to get close to Sam Dobrow and whoever [*sic*] else you think appropriate"; indicated that when deJourno came to New York on January 11, "he might call you for some advice on how to proceed with DPL [Lieblich] and group"; and noted that Browne had spoken with Gerard, "who painted a black picture regarding a Tender Offer just yet."

**31.** In addition to the letter described in footnote 30, *supra*, a memorandum from Bouwer to Browne dated December 14, 1978, discussed the proposed acquisition of a screw machine

company that Care was considering at that time. Regarding Care's ability to manage the screw machine company, if it were acquired, Bouwer cautioned:

> if Treadway turns out to be the full-time job of more than one of our top management, we may tend to slight the screw machine [company] to our long run detriment.

The memorandum concluded:

> In summary, it seems to me that we should pursue our Treadway investment, until we understand the management and financial resources it will require to conclude it and then make the decision on the acquisition of the screw machine company.

Noting that it was "bothered" by the haste with which the Treadway-Fair Lanes negotiations had been conducted, the court found that

incumbent management of Treadway was willing to agree to whatever terms were necessary, however detrimental to the interests of the corporation or its shareholders, in order to quickly consummate the sale and thereby retain control of the corporation at the next annual shareholders meeting.

*Id.* at 686. (footnote omitted) The court also noted that "Treadway has consistently structured its proposed transactions so as to avoid shareholder scrutiny." (*Id.*) The court found that "no good faith effort was ever made by incumbent management of Treadway to determine whether a takeover by Care would or would not be in the best interests of the corporation or its shareholders," and that Lieblich had from the outset determined to oppose such a takeover "at all costs." *Id.* at 686. Although all of the foregoing findings concerned "incumbent management," or "Treadway" or Lieblich, the court went on to conclude that

[t]he determination of the board of directors that a Care takeover would not be in the best interests of the corporation was reached for the purpose of perpetuating its own control, and not with the best interests of the corporation in mind.

(*Id.*)

Finally, the court stated that it was "extremely troubled" by the fact that Treadway had sold stock to Fair Lanes for the stated purpose of diluting Care's interest below the 33⅓% level, and thus eliminating Care's ability under N.J.Stat.Ann. § 14A:10–3(2) (West 1969), to block shareholder approval of a merger with Fair Lanes. Opining that

it would be highly inappropriate to allow this statutory provision, specifically intended to prevent unfair combination by the controlling interests, to be so easily

circumvented by the simple act of management issuing and selling shares, without any form of shareholder approval, for the stated purpose of diluting the minority interest,

*Id.* at 686, the court concluded that Treadway's "attempt to circumvent" the provision "is, in many ways, the most objectionable aspect of the instant transaction." *Id.* at 687.

The court then summarized its findings, and the conclusion it drew therefrom, as follows:

As the primary purpose of the sale of stock to Fair Lanes was to influence the proxy contest, perpetuate incumbent management's control over Treadway, thwart Care's takeover bid, and dilute Care's statutory blocking position so as to influence the subsequent shareholders' vote on a proposed business combination, the Court finds that the issuance and sale of stock was improperly motivated, entered into for no legitimate business purpose, and constitutes a violation by the director defendants of their fiduciary duty.

*Id.* at 687. (footnote omitted) The court went on to state, however, that it was "the voting, and not the sale, of the shares which the Court has found to be impermissible." (*Id.*) Accordingly, the court ordered that the voting of the shares be permanently enjoined, that the 230,000 votes cast by Fair Lanes at the annual meeting not be counted, and that the Care slate of nominees be declared the new directors of Treadway.[32]

The district court denied Treadway's motion for a stay pending appeal. On May 1, 1980, however, this Court granted a stay and ordered that the appeal be expedited.

## II. TREADWAY'S CLAIMS

We consider first Treadway's claims against Cowin, Browne, deJourno and Care.

---

32. On May 2, after the district court had entered its judgment in this case Dobrow moved that court to amend the judgment insofar as it ran against him, apparently on the ground that his resignation was tendered before the board had completed its consideration of the Fair Lanes stock sale and merger proposals. Counsel for Care subsequently consented to the amendment.

On appeal, Treadway argues that the individual defendants committed various breaches of the fiduciary duties that they owed to Treadway and its shareholders, and that all defendants violated § 13(d) of the 1934 Act. Treadway asserts that Care should be ordered to divest itself of its Treadway shares, or should at least be enjoined from voting them. We conclude that the individual defendants did not breach any fiduciary duties, and that the district court properly denied relief on the § 13(d) claim. We thus affirm so much of the judgments appealed from as dismissed Treadway's claims.

### A. The claims against Cowin

As a director of Treadway, Cowin owed that corporation a duty of due care and good faith. N.J.Stat.Ann. § 14A:6–14 (West 1969); *Daloisio v. Peninsula Land Co.*, 43 N.J.Super. 79, 127 A.2d 885, 890 (App.Div.1956). Treadway argues that Cowin also owed fiduciary duties to the corporation and its shareholders by reason of his positions as a major shareholder and as a paid financial consultant. Treadway asserts that Cowin breached these duties in three ways: by passing confidential information to Care; by advising Care to buy Treadway stock on the open market rather than by tender offer, and then subsequently selling his own shares to Care at a premium; and by failing to disclose to Treadway his contacts with Care and his knowledge of Care's plans regarding a takeover of Treadway. All of these contentions must be rejected.

■ 1. The district court found that Cowin did not disclose any confidential or proprietary information to Care. This finding is not clearly erroneous. Fed.R.Civ.P. 52(a). Treadway focuses on the information that was in Cowin's possession concerning the proposed Inns Division spin-off and the Helmsley-Spear report evaluating that spin-off. There is no basis in the record, however, for concluding that Cowin actually passed this information. Cowin testified that he may have discussed the spin-off with Leake and other Care representatives in June 1978. These conversations apparently occurred after Treadway had publicly announced that the spin-off was under consideration. But in any event there is no evidence that the conversation was in other than very general, nonconfidential terms. Cowin certainly denied discussing the Helmsley-Spear report or disclosing any information about the Inns Division itself, and the district court could properly credit this testimony. Thus, although there were opportunities for Cowin to pass confidential information, the record is barren of evidence that he availed himself of those opportunities.[33]

■ 2. Treadway's second argument is that Cowin breached duties owed to it and to its shareholders by counseling Care against making a tender offer, at the March 21, 1978, meeting with Browne, and then selling his shares to Care at a premium. Treadway strongly implies that Cowin thereby diverted that premium from the shareholders as a group to himself. But there appears to be no factual basis for inferring that Cowin's advice in March against a tender offer was part of a purposeful plan or design to maximize the price that he would obtain. The district court found that Cowin did not begin to consider selling his shares until several months thereafter. And given the finding that Cowin did not misuse any confidential in-

---

**33.** At trial, Cowin testified that his first meeting with Browne took place in early June, and that at that meeting

> [t]hey may have asked me whether I was aware—or what my opinion was of the idea of spinning off the motel division. But I do not know for sure if they asked me that. Q. What did you tell them? A. I don't remember. I probably told them I was in favor of it.

In fact, the first Cowin-Browne meeting took place on March 21, 1978, before so far as it appears, the spin-off had been publicly announced. Assuming that Cowin was actually referring to the March meeting, the district court could properly have considered Cowin's speculation as entirely inadequate to show that the spin-off was discussed.

formation,[34] there is no legal basis for holding Cowin liable for either of the discrete events, i. e., for giving the advice or for obtaining a premium for his own shares.

On the matter of Cowin's advising Care not to make a tender offer, the question before us reduces to whether Cowin owed a duty to the shareholders to preserve or promote the possibility that Care would purchase from them at a premium. We find no such duty. In New Jersey, as elsewhere, the directors of a corporation owe various fiduciary duties to that corporation, and, indirectly, to the corporation's shareholders insofar as the corporation's affairs are concerned. But the majority rule, followed by New Jersey, is that a director does not owe a fiduciary duty directly to the shareholders with respect to the shares of stock they own. The only New Jersey cases discussing this question involved face-to-face purchases of shares by directors from shareholders, and the New Jersey courts have uniformly held that in such a situation, a director owes no fiduciary duty to a shareholder. Thus the director is under no obligation to disclose to his seller information obtained by reason of the director's official position. *Crowell v. Jackson*, 53 N.J.L. 656, 23 A. 426 (Ct.Err. & App.1891); *Connolly v. Shannon*, 105 N.J.Eq. 155, 147 A. 234 (Ch.1929), *aff'd*, 107 N.J.Eq. 180, 151 A. 905 (Ct.Err. & App.1930); *Gardner v. Baldi*, 24 N.J.Super. 228, 93 A.2d 644 (Ch. Div.1952). And he has no obligation to account for any profits that he obtains from such transactions. *Keely v. Black*, 91 N.J.Eq. 520, 111 A. 22 (Ct.Err. & App.1920). In *Keely* a shareholder who was not involved in the transactions at issue sought unsuccessfully to have a director account for profits made on purchases of stock from other shareholders. The court stated as follows:

It seems to us that [the defendant director] had a perfect right, as an individual, to purchase the stock from the holders thereof at such prices as he and they should agree on, and after buying it he was entitled to sell it again for such price as he and a purchaser should agree on. In these transactions he occupied no relation of trust, either to the Farmers' Company or to the various stockholders; for it is important to observe that he was not dealing with the property of the company, but with his own, the title to some of which he derived from other stockholders.

111 A. at 23. In *Crowell, Connolly* and *Gardner*, selling shareholders sought recovery from the purchasing directors on theories of fraudulent nondisclosure. Thus, the narrow issue presented was whether the director had a duty to disclose. *See Roxbury State Bank v. The Clarendon*, 129 N.J. Super. 358, 324 A.2d 24 (App.Div.1974); 3 Pomeroy's Equity Jurisprudence § 901 (5th ed. 1941). If presented with the fraud issue today, a New Jersey court might well reach a different result, *see Judson v. Peoples Bank & Trust Co.*, 25 N.J. 17, 134 A.2d 761, 767 (1957) (noting in dictum that the "narrow" rule of *Crowell, Connolly* and *Gardner* had been "much criticized," but omitting— perhaps significantly—reference to *Keely*),[35] very likely by expanding the concept of the duty to disclose. *Cf. Jewish Center v. Whale*, 165 N.J.Super. 84, 397 A.2d 712, 714 (Ch.Div.1978) (nondisclosure actionable where defendant "is bound in conscience and duty to recognize that the facts so concealed are significant and material and are facts in respect to which he cannot innocently be silent"), *aff'd*, 172 N.J. Super. 165, 411 A.2d 475 (App.Div.1980). Such a ruling on the fraud issue, however, would not affect the basic principle laid down in *Keely*—where the shareholder sought to have the director account for

---

**34.** Cowin's opinion as to whether it was feasible to purchase a "reasonable amount" of stock on the open market appears to have required no more basis than publicly available data as to the number of shares outstanding, the number of shareholders, and the volume of trading.

**35.** It would appear that the particular issue—a director's common law liability for trading on inside information—has been largely mooted by the advent of a federal cause of action under § 10(b) of the 1934 Act and Rule 10b–5, 17 C.F.R. § 240.10b–5 (1979). Assuming materiality and scienter, such non-disclosure would clearly be actionable under the Rule.

profits obtained by purchases from *other* shareholders—that a director is not a trustee as to shares of stock held by individual shareholders. So far as we can determine, that holding of *Keely* is still good law. *Cf.* 3 Fletcher, Cyclopedia of the Law of Private Corporations § 848 (perm.ed. 1975) (majority rule is that director is not trustee as to individual shareholders). More specifically, and whatever may be the rule governing transactions between a director and a shareholder, we see no reason to believe that the New Jersey court would cast on the director a duty to protect or promote the shareholders' interests in their dealings with third parties.[36] Thus, Cowin was under no duty to try to persuade Treadway to make a tender offer, and breached no duty when he advised against such an offer.

█ We also conclude that Cowin breached no duty in selling his own shares to Care at a premium. Apparently Treadway's argument is that Cowin had a duty to afford the other shareholders an opportunity to participate in the sale, either because he was a director or because he was Treadway's "largest shareholder." We find both theories unpersuasive.

█ Treadway has pointed us to no case, and we know of none, in which a director was required, solely by reason of his status as director, to account to the shareholders for profits earned on the sale of his shares.

Ordinarily a director possesses the same right as any other stockholder to deal freely with his shares of stock and to dispose of them at such a price as he may be able to obtain, provided the director acts in good faith, since the corporation as such has no interest in its outstanding stock or in dealing in its shares among its stockholders.

3 Fletcher, *supra* at § 900 (footnotes omitted). New Jersey law is in accord with this general principle. *See Keely v. Black, supra. See also Wellman v. Dickinson*, 475 F.Supp. 783, 835 (S.D.N.Y.1979) (applying New Jersey law). There is no indication that Cowin acted other than in good faith toward Treadway and its shareholders. The district court found that Cowin did not misuse confidential information and that he did not usurp any corporate opportunity.[37] Cowin's sale permitted Care to increase its stake in Treadway, but the district court found that neither Treadway nor its shareholders were thereby harmed in any way. Thus, we see nothing that would take this case outside the general principle that a director is free to sell his stock at whatever price he may obtain.

█ Nor do we find that Cowin's status as Treadway's "largest shareholder" carried with it a duty to share his premium with the other shareholders. It is true that in

**36.** Treadway refers us to *Brown v. Halbert*, 271 Cal.App.2d 252, 76 Cal.Rptr. 781 (1969), but we find that case readily distinguishable. The defendant in *Brown* was the majority shareholder, as well as being the president and chairman of the board of directors. He sold his controlling block of shares to a third party at a premium ($1,548.05 per share), and then—largely by means of his continuing official position as officer and director—helped the buyer to accumulate minority shares at a substantially lower price ($300 per share). One device used was the withholding of dividends, which theretofore had been paid regularly. Then the defendant visited upon minority shareholders and told them it might be a considerable number of years before payment of dividends would be resumed, and that if they did not sell for $300 they might get nothing.

**37.** Treadway appears to have argued, at various times (1) that Treadway, instead of Care, should have been allowed to buy Cowin's 175,-000 shares, and (2) that Treadway, instead of

Cowin, should have been allowed to sell 175,-000 of its own shares to Care. It is only the latter possibility that implicates principles of corporate opportunity. That doctrine, in essence, forbids an officer or director from competing with his corporation with respect to an advantageous opportunity in which the corporation has an interest. *See, e. g., Vulcanized Rubber & Plastics Co. v. Scheckter*, 400 Pa. 405, 162 A.2d 400, 405 (1960); 3 Fletcher, *supra* at § 861.1. As to this latter possibility, even assuming that the possible sale of shares to Care would have been considered an advantageous opportunity by Treadway, it should be noted that Treadway could not have sold to Care on the same terms agreed to by Cowin, *i. e.*, partially deferred payment, since New Jersey law requires the payment of full consideration for the issuance of new shares of stock. *See* N.J.Stat.Ann. §§ 14A:7-3(3), 14A:7-5(1) (West Cum.Supp.1979).

certain circumstances, a *controlling* shareholder may be required to account to the minority shareholders for the "control premium" he obtains upon selling his controlling shares.[38] *See Perlman v. Feldman*, 219 F.2d 173 (2d Cir.), *cert. denied*, 349 U.S. 952, 75 S.Ct. 880, 99 L.Ed. 1277 (1955). *But see Clagett v. Hutchison*, 583 F.2d 1259, 1263–64 (4th Cir. 1978); *McDaniel v. Painter*, 418 F.2d 545 (10th Cir. 1969). But Cowin was not a controlling shareholder. At the time of his sale, Cowin owned only 14% of Treadway's outstanding stock; the district court specifically found that Cowin did not have control of the corporation.[39] Since Cowin therefore did not transfer control, he was under no duty to account for the premium he obtained. *Cf. Clagett v. Hutchison, supra*, 583 F.2d at 1263 (seller transferring less than a control block is under no obligation to investigate his purchaser).

■ 3. Treadway's third argument is that Cowin breached the duty of good faith that he owed to Treadway as a director by failing to disclose his contacts with Care and his knowledge of Care's intentions to seek control of Treadway. Treadway places great reliance on the district court's statement that Cowin, in failing to disclose his dealings with Care, "betray[ed]" "the trust placed in him by incumbent management." But, as the district court properly recognized, this fact has no legal significance. Management—as distinct from the corporation—had no legitimate claim to Cowin's allegiance. Rather, Cowin owed his fiduciary duties to the corporation, and through the corporation to the shareholders. Treadway has not shown that those duties were not fulfilled. Specifically, Treadway has offered no support for the proposition that the duty of good faith that Cowin owed to Treadway carried with it a duty to disclose any information about Care.

"Generally speaking, a corporation as such has no interest in its outstanding stock, or in dealings by its officers, directors or shareholders with respect thereto." *Vulcanized Rubber & Plastics Co. v. Scheckter*, 400 Pa. 405, 162 A.2d 400, 404 (1960). *See Wellman v. Dickinson, supra*. Thus, as a general matter, a director has no duty to disclose his stock dealings to the corporation and no duty to offer his shares to the corporation before he sells them to another.

■ Treadway argues—without offering supporting authority—that the present "takeover" situation was exceptional, and that its board had a right and a duty to "investigate the Care situation," and examine alternatives such as suing to prevent Cowin's sale to Care or causing Treadway itself to purchase Cowin's shares. But such a duty of investigation by the Treadway board does not impose on Cowin a duty to disclose to the Treadway board. As noted above, there was no breach by Cowin of any duty to Treadway or its shareholders. Thus, although Cowin himself would have had an obligation to investigate Care if, contrary to the findings made in this case, Cowin were selling control of Treadway and there were reason to believe Care intended to loot or mismanage Treadway, *see Insuranshares Corp. v. Northern Fiscal Corp.*, 35 F.Supp. 22 (E.D.Pa.1940); 13 Fletcher, *supra* at § 5805 (perm.ed. 1970), we conclude that in this case Cowin was under no duty to make the disclosures Treadway contends for. In the circumstances here Cowin had a right to sell his shares to Care as he did, and Treadway had no right to prevent him. Hence we decline to impose on Cowin a duty to disclose his negotiations with Care. Cowin's right to sell must imply a right to

---

**38.** We are not concerned here with the rule that a majority shareholder should refrain from selling his stock and thus transferring control where he knows or has reason to know that the purchaser intends to loot or mismanage the corporation or otherwise injure its shareholders. *See Insuranshares Corp. v. Northern Fiscal Corp.*, 35 F.Supp. 22 (E.D.Pa.1940); 13 Fletcher, *supra* at § 5805 (perm.ed. 1970). The district court found that "there is no evidence

that Cowin knew or should have known—or that there was any likelihood—that Care would loot or intentionally mismanage Treadway if it gained control." 490 F.Supp. at 683 n.27.

**39.** The court noted that in December 1977 Cowin had requested that he be made Chairman of Treadway's board of directors, but that the other directors refused this request.

do so in a manner that will not invite Treadway to interfere.

### B. *The claims against Browne and deJourno*

Treadway claims that Browne and de-Journo, by reason of their participation in Care's efforts to win control of Treadway, breached various duties which they owed as Treadway directors. As presented to this Court, the argument seems to have three prongs. First, Treadway asserts that at all times Browne and deJourno placed Care's interest in obtaining control of Treadway above any interest of Treadway itself, and thus never acted in good faith with regard to their positions as Treadway directors. Second, Treadway argues that Browne and deJourno breached duties owed to Tread-way's shareholders, by causing Care to purchase Treadway stock at the lowest possible price, and to acquire a "blocking position" in the stock. Finally, Treadway argues that Browne and deJourno breached their fiduciary duties to Treadway by failing to disclose, and by falsely denying to the other members of Treadway's board, Care's intention to seek control of Treadway. Tread-way contends that the appropriate remedy for these breaches by Browne and deJourno is an order either requiring Care to divest itself of Treadway stock, or barring Care from voting that stock. We conclude that the district court properly denied relief on these claims.

■■■■ Treadway's first, and broadest, argument is that Browne and deJourno breached the duty of good faith which they owed to Treadway as directors, in that they placed Care's interest in obtaining control of Treadway above any interest of Tread-way itself. This argument assumes that Care's interest conflicted with those of Treadway. But there was certainly no theoretical conflict; it is well recognized that a director does not necessarily breach any duty owed to the corporation by promoting a change of management. *See Wellman v. Dickinson, supra*, 475 F.Supp. at 835; *Vulcanized Rubber & Plastics Co. v. Scheckter, supra. See also Campbell v. Loew's, Inc.,* 36

Del.Ch. 563, 134 A.2d 852, 860 (1957). Nor did Treadway show that there was any actual conflict between the interests of the two corporations in this case. The district court found no basis to believe that Browne and deJourno's support of a Care takeover "was in any way adverse to the best interests of the shareholders, as opposed to the incumbent management, of Treadway." 490 F.Supp. at 684. Treadway has not shown this finding to be erroneous. It is true that Treadway's board determined, at its November 13, 1979, meeting, that a takeover by Care would not be in Tread-way's best interests. But Browne and de-Journo were "under no duty to follow management blindly"; *Wellman v. Dickinson, supra,* 475 F.Supp. at 835; indeed, they were under a duty to exercise their own best judgment on Treadway's behalf. From all that appears, this is precisely what they did. The district court correctly determined that Browne and deJourno did not breach any duty owed to Treadway merely by supporting Care's efforts to win control.

■■■ Treadway's second argument is that Browne and deJourno breached their duties as Treadway directors by causing Care to purchase its Treadway stock at the lowest available price, and to acquire a "blocking position" in the stock. We find these points to be meritless. As discussed in Part II(A)(2) above, New Jersey law permits a director, like any other shareholder, to deal in the shares of the corporation and, barring fraud, to buy and sell at whatever price he can. *Keely v. Black, supra*; 3 Fletcher, *supra* at § 900. Thus, the fact that Browne and deJourno were Treadway directors did not limit Care's freedom to purchase Treadway stock on the open market. Since there is no indication here that Care acted on the basis of inside information or that any sellers were coerced or otherwise defrauded, there is no basis whatever for imposing on Browne and deJourno, as Treadway directors, a duty to cause Care to maximize the prices paid to Treadway shareholders.

■■■ We also see nothing wrong in Care's efforts to acquire one third of Tread-

way's outstanding stock, and thus to obtain a "blocking position." "[T]here can be nothing improper so far as the corporate entity is concerned with one of its fiduciaries, be he officer, director or otherwise, buying up a controlling number of shares"; *Vulcanized Rubber & Plastics Co. v. Scheckter, supra*, 400 Pa. 405, 162 A.2d at 404–05; *a fortiori*, there is nothing wrong with such a fiduciary acquiring a non-controlling position.

Somewhat more substantial is Treadway's third argument, that Browne and deJourno breached their duties as Treadway directors by failing to disclose and by falsely denying Care's intention to obtain control of Treadway. We need not concern ourselves with the asserted failures to disclose; Browne and deJourno had no duty to speak. *See Wellman v. Dickinson, supra; Vulcanized Rubber & Plastics Co. v. Scheckter, supra*. But affirmative misrepresentations are another matter. There is evidence in the record that on at least two occasions after he became a Treadway director,[40] Browne made such misrepresentations: first, when at his first board meeting as a Treadway director, in February 1979, he denied that Care had determined to seek control; and second, when at the board meeting of August 23, 1979, he denied that Care had resumed open market purchases of Treadway stock.[41] We shall assume that in making misstatements, Browne breached the duty of good faith which he owed to Treadway as a director. But turning to the question of remedy, we conclude that Treadway has not demonstrated any right to the relief it requests.

It is clear that a director may be held liable for only such damage as is the direct result of his wrongful acts, and that the corporation is entitled only to such relief as would remedy that damage. *Cf.* 3 Fletcher, *supra* at § 992. The only relief that Treadway has sought in this action is divestiture or disenfranchisement of Care's Treadway stock. However, we can discern no causal relationship between Browne's misstatements and Care's ownership or voting of that stock. As a preliminary matter, it does not appear that Treadway's management ever relied on Browne's misrepresentations. Shortly after the February 1979 board meeting at which Browne falsely denied Care's intent to seek control, Lieblich engaged Swordco to begin looking for alternative merger partners. Within days after Browne supposedly denied that Care had resumed open market purchases, Lieblich commenced his own efforts to find a merger partner; and within a matter of weeks Treadway had retained special counsel and filed the present action. In spite of Browne's disclaimers, therefore, Treadway's management was quick to make preparations to resist a Care takeover.

More importantly, Browne's misstatements did not cause, or assist, or in any other way affect Care's acquisitions of Treadway stock. Care acquired the bulk of that stock before deJourno and Browne became directors, that is, before the misstatements at issue here were made. Care obtained the rest of its stock by open market purchases, and it is difficult to see what effect Browne's misstatements could have had with regard to those transactions. Because Treadway has shown no causal link between Browne's misstatements and Care's ownership and voting of its shares,[42]

---

**40.** The district court found that although Care had misrepresented its intentions in the period before deJourno was made a Treadway director, those statements "were not material to (and did not induce)" the decision by Treadway's board to offer deJourno a directorship. 490 F.Supp. at 683. Treadway has not shown this finding to be clearly erroneous; nor has it shown how it may have been damaged by those misstatements. Thus, we concern ourselves only with the misrepresentations made after deJourno, and then Browne, became Treadway directors.

**41.** *See* note 9 and accompanying text *supra*.

**42.** Thus, contrary to Treadway's assertion, the present case bears no resemblance to cases in which outsiders make an illegal tender offer for the target company's shares. In the latter situation, the illegality lies in the actual acquisition of shares, and the remedy of divestiture would be directly responsive to the harm caused thereby. *Cf. S.E.C. v. Sun Co.*, [1979–1980 Transfer Binder] Fed.Sec.L.Rep. (CCH) ⸢ 97,209 (S.D.N.Y.1979) (announcing settlement in which tender offeror agreed to divestiture).

there is simply no basis for an order requiring divestiture or disenfranchisement. The district court properly denied relief on this claim.

## C. *The § 13(d) claim against Care*

 Treadway's complaint alleged that Care had violated § 13(d)[43] of the 1934 Act by filing materially false and misleading Schedule 13D's with the SEC. Specifically, Treadway charged that Care failed to disclose, in its original Schedule 13D and in its amendments filed through September 1979, that it was purchasing Treadway stock for the purpose of obtaining control.[44] On November 2, 1979, Care filed another amendment to its Schedule 13D, disclosing unequivocally that it had determined to seek control of Treadway. The district court ruled that the November 2 amendment had cured any deficiencies in the earlier filings, and that Treadway's § 13(d) claim should therefore be dismissed. We agree.

The goal of § 13(d) "is to alert the marketplace to every large, rapid aggregation or accumulation of securities . . . which might represent a potential shift in corporate control." *GAF Corp. v. Milstein*, 453 F.2d 709, 717 (2d Cir. 1971), *cert. denied*, 406 U.S. 910, 92 S.Ct. 1610, 31 L.Ed.2d 821 (1972). But as the Supreme Court noted in *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 58, 95 S.Ct. 2069, 2076, 45 L.Ed.2d 12 (1975), "Congress expressly disclaimed an intention to provide a weapon for management to discourage takeover bids or prevent large accumulations of stock which would create the potential for such attempts." *See* S.Rep.No.550, 90th Cong., 1st Sess., 3

(1967); H.R.Rep.No.1711, 90th Cong., 2d Sess., 4 (1967). Thus, an injunction will issue for a violation of § 13(d) only on a showing of irreparable harm to the interests which that section seeks to protect. *Rondeau v. Mosinee Paper Corp., supra.* Those interests are fully satisfied when the shareholders receive the information required to be filed. *See General Aircraft Corp. v. Lampert*, 556 F.2d 90, 97 (1st Cir. 1977).

The district court correctly determined that on the facts alleged, Treadway was not entitled to injunctive relief. Care's November 2 filing expressly declared Care's intent to seek control of Treadway; Treadway's shareholders had ample time to digest this information. Contrary to Treadway's suggestion, this is not a case in which a takeover attempt "followed on the heels" of a belated curative filing. Rather, the shareholders had four months to ponder Care's November 2 filing, before being asked, in the proxy contest, to reach any decision about a Care takeover. Since the informative purpose of § 13(d) had thereby been fulfilled, there was no risk of irreparable injury and no basis for injunctive relief.[45]

## III. CARE'S COUNTERCLAIMS

 We now turn to that part of the judgment which enjoined the voting of the 230,000 shares of Treadway stock held by Fair Lanes. Care maintains that Treadway's incumbent management caused those shares to be sold for the sole or primary purpose of retaining its control of the corporation, and that the injunction was there-

---

43. *See* note 4 *supra.*

44. Treadway also alleged that Care had failed to disclose the existence of a group—consisting of Care, Browne, deJourno and Cowin—formed for the purpose of obtaining control of Treadway. The district court determined that the members of the alleged group other than Care held only 2500 Treadway shares; the court held that failure to disclose the existence of the group was therefore a *de minimis* violation, not warranting injunctive relief. 490 F.Supp. 660. Treadway has not contested this ruling on appeal.

45. Treadway also argues that where a defendant obtains "a degree of effective control" as a result of purchases made before it has complied with § 13(d), "disenfranchisement or divestiture may be appropriate." *See Financial Gen'l Bankshares, Inc. v. Lance*, [1978 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,403 at 93,-427 (D.D.C.1978). Whatever may be the merit of that proposition—a question on which we express no view—it cannot assist Treadway here. Care has never had "a degree of effective control" over Treadway; Treadway's other shareholders, now fully informed about Care's intentions, remain free to accept or reject Care's overtures.

fore proper. Treadway counters that its directors made good faith determinations that a takeover by Care was not in Treadway's best interests, that a merger with Fair Lanes would be in Treadway's best interests, and that the stock sale was a necessary and proper step toward avoiding the former and implementing the latter. Treadway contends that its directors had no interest in the transaction, and acted in good faith, and that the stock sale must therefore be upheld under the business judgment rule. We agree that the business judgment rule, which presumes that directors have acted properly, must be applied to this case. It follows that Care, in attacking the stock sale, had the burden of proving that Treadway's directors acted in bad faith, or in furtherance of their own interests, or for some other improper purpose. We find that Care has failed to carry this burden. Accordingly, we reverse the district court's judgment insofar as it enjoined the voting of Fair Lanes' shares.

The starting point in our analysis is the business judgment rule. In New Jersey, as elsewhere, the management of a corporation is entrusted to its board of directors. N.J.Stat.Ann. § 14A:6–1 (West Cum.Supp. 1979). Accordingly,

> Individual stockholders cannot question in judicial proceedings the corporate acts of directors, if the same are within the powers of the corporation and in furtherance of its purposes, are not unlawful or against good morals, and are done in good faith and in the exercise of an honest judgment. Questions of policy of management, of expediency of contracts or action, of adequacy of consideration not grossly disproportionate, of lawful appropriation of corporate funds to advance corporate interests, are left solely to the honest decision of the directors, if their powers are without limitation and free from restraint.

*Ellerman v. Chicago Junction Rys. & Union Stock-Yards Co.*, 49 N.J.Eq. 217, 232, 23 A. 287, 292 (Ch.1891), *quoted in Daloisio v. Peninsula Land Co., supra*, 127 A.2d at 892.

*See also Papalexiou v. Tower West Condominium*, 167 N.J.Super. 516, 401 A.2d 280, 285–86 (Ch.Div.1979); *Exadaktilos v. Cinnaminson Realty Co.*, 167 N.J.Super. 141, 400 A.2d 554, 559 (L.Div.1979).

On the face of things, there appears to be no inherent reason why the stock sale to Fair Lanes should not be analyzed under the foregoing business judgment rule. The possibility of a Care takeover was obviously a matter of great importance to Treadway and its shareholders. It was only reasonable that Treadway's board, which is charged with managing the corporation, should examine the situation to make a judgment as to where the best interests of Treadway lay. Once they determined that a Care takeover would be detrimental to Treadway, it was similarly reasonable that the directors should move to oppose it. *See McPhail v. L. S. Starrett Co.*, 257 F.2d 388, 395–96 (1st Cir. 1958); *Northwest Indus., Inc. v. B. F. Goodrich Co.*, 301 F.Supp. 706, 712 (N.D.Ill.1969). In thus acting on matters within the scope of their legitimate concern, the directors would seem to be protected by the business judgment rule. The district court, however, did not apply the standard business judgment analysis. Rather, it focused on the immediate step taken by Treadway's board to oppose the prospective Care takeover: the issuance and sale of a large block of stock. The unstated premise was that the business judgment rule does not apply to such transactions.

In asking us to uphold the district court's ruling, Care has placed principal reliance on a series of cases holding that incumbent management may not manipulate the issuance and sale of stock for the sole or primary purpose of retaining control. *E. g., Chicago Stadium Corp. v. Scallen*, 530 F.2d 204 (8th Cir. 1976); *Kullgren v. Navy Gas & Supply Co.*, 110 Colo. 454, 135 P.2d 1007 (1943); *Carlson v. Ringgold County Mut. Tel. Co.*, 252 Iowa 748, 108 N.W.2d 478 (1961); *Elliott v. Baker*, 194 Mass. 518, 80 N.E. 450 (1907); *Hilles v. Parrish*, 14

N.J.Eq. 380 (Ch.1862).[46] Of course, these cases must be read in the light of a second group of cases in which courts have upheld corporate stock transactions intended to affect control, where the directors have shown that the transactions were entered into for proper corporate purposes. *E. g., Cheff v. Mathes,* 41 Del.Ch. 494, 199 A.2d 548 (1964); *Kors v. Carey,* 39 Del.Ch. 47, 158 A.2d 136 (Ch.1960); *Hendricks v. Mill Eng'r & Supply Co.,* 68 Wash.2d 490, 413 P.2d 811 (1966). The cases in this area demonstrate that the courts are sensitive to the risks of self-dealing and abuse which inhere in corporate stock transactions that are intended to affect control. But at the same time courts have recognized that in certain circumstances, it is proper for management to cause the corporation to enter into such transactions. The law in this area is something less than a seamless web; some of the cases are not easily reconciled. We have concluded, however, that far from constituting an area that is beyond the purview of the business judgment rule, these cases are best reconciled by reference to the analysis typically employed under that rule.

Under the business judgment rule, directors are presumed to have acted properly and in good faith, and are called to account for their actions only when they are shown to have engaged in self-dealing or fraud, or to have acted in bad faith. Once a plaintiff demonstrates that a director had an interest in the transaction at issue, the burden shifts to the director to prove that the transaction was fair and reasonable to the corporation. *Daloisio v. Peninsula Land Co., supra,* 43 N.J.Super. 79, 127 A.2d at 893; *Geddes v. Anaconda Copper Co.,* 254

U.S. 590, 599, 41 S.Ct. 209, 212, 65 L.Ed. 425 (1921). Only if the director carries this burden will the transaction be upheld. The initial burden of proving the director's interest or bad faith, however, always rests with the plaintiff. *Cf. Sinclair Oil Corp. v. Levien,* 280 A.2d 717 (Del.1971); *Kaplan v. Goldsamt,* 380 A.2d 556, 568 (Del.Ch.1977).

In nearly all of the cases treating stock transactions intended to affect control, the directors who approved the transaction have had a real and obvious interest in it: their interest in retaining or strengthening their control of the corporation. It is this interest which causes the burden of proof to be shifted to the directors, to demonstrate the propriety of the transactions. *See Bennett v. Propp,* 41 Del.Ch. 14, 187 A.2d 405, 409 (1962) (where corporate funds are used to buy out an insurgent, "[t]he directors are of necessity confronted with a conflict of interest"; accordingly, burden shifted); *Petty v. Penntech Papers, Inc.,* 347 A.2d 140, 143 (Del.Ch.1975); 70 Yale L.J. 308, 317 (1960) (burden shifts "after the plaintiff-shareholder makes a reasonable showing that the purchase resulted in the elimination of a shareholder whom the directors viewed as a potential insurgent"). *See also Condec Corp. v. Lunkenheimer Co.,* 43 Del.Ch. 353, 230 A.2d 769, 773–74 (1967) (incumbent management's interest in retaining their positions). Once the burden has shifted, the directors must show that the transaction was fair, in the sense that it was entered into for a proper corporate purpose, and not merely for the directors' selfish purposes.[47] *Cheff v. Mathes, supra,* 41 Del.Ch. 494, 199 A.2d at 555; *Petty v. Penntech Papers, Inc., supra,* 347 A.2d at

---

**46.** Care also refers us to a number of cases involving the preemptive rights of shareholders to share *pro rata* in issuances of the corporation's stock. *E. g., Trask v. Chase,* 107 Me. 137, 77 A. 698 (1910); *Glenn v. Kittanning Brewing Co.,* 259 Pa. 510, 103 A. 340 (1918); *Luther v. C. J. Luther Co.,* 118 Wis. 112, 94 N.W. 69 (1903); *see also Way v. American Grease Co.,* 60 N.J.Eq. 263, 47 A. 44 (1900). Care has not argued that it had any preemptive right to purchase a portion of the shares issued to Fair Lanes, and it appears to have no such right since Treadway's certificate of incorporation does not grant such rights. *See* N.J.Stat.

Ann. § 14A:5–29(1) (West Cum.Supp.1979). Accordingly, these preemptive rights cases are of no more than tangential relevance to the issues on this appeal.

**47.** Courts have held that the directors can make a sufficient showing of fairness by demonstrating that the transaction was entered into for a proper corporate purpose; they need not also prove that the actual terms of the transaction were fair. *See Cheff v. Mathes, supra,* 41 Del.Ch. 494, 199 A.2d at 554–55; *Kaplan v. Goldsamt, supra,* 380 A.2d at 568–69.

143. All of the foregoing is perfectly consistent with business judgment rule analysis, and we conclude that that analysis is fully applicable to this sort of case. The necessary corollary of that conclusion is that in attacking a transaction that was intended to affect control, plaintiff (or here, counterclaimant) bears the initial burden of proving that the directors had an interest in the transaction, or acted in bad faith or for some improper purpose.[48]

Turning to the record before us, we conclude that the evidence does not permit a finding that Care has carried that burden. The critical fact, in our view, is that the Treadway board was simply not acting to maintain its own control over the corporation. Rather, in approving the stock sale, they were moving Treadway toward a business combination with Fair Lanes. Fair Lanes had made the stock sale a precondition to further merger talks. From all that appears, Fair Lanes and Treadway had every intention of carrying through with that merger. Hall testified that Fair Lanes had been interested for some years in a possible merger with Treadway; and Care has not offered any evidence to suggest that the merger talks were a sham or a pretext, or that the Treadway directors did not seriously wish to pursue the merger. Moreover, Care made no showing that the directors other than Lieblich had any personal interest in having the merger consummated. Only Lieblich had reason to anticipate that he would be given any position, or have any role to play, in the new merged entity. The district court found that the other directors expected that they would lose their positions as Treadway directors and would not be offered new ones.[49] This expectation seems reasonable in light of the facts that during the negotiations Fair Lanes had requested that it be allowed to name a majority of the Treadway directors immediately, and that after the proposed merger Fair Lanes would own more than 80% of Treadway's stock. Thus the consummation of the proposed business combination could not be expected to perpetuate control by these directors.

On the basis of the foregoing, we can only conclude that Care has not demonstrated an interest on the part of Treadway's directors—other than Lieblich—such as would shift onto the directors the burden of proving fairness. The disinterested majority is therefore protected by the business judgment rule, cf. N.J.Stat.Ann. § 14A:6–8 (West Cum.Supp.1979) (disinterested directors may approve contract between corporation and another director), and the transaction must be upheld unless Care has proven that it was entered into in bad faith.

In analyzing this issue, and concluding that Treadway's directors had not acted in good faith, the district court focused primarily on Lieblich. There was ample evidence to support a finding that Lieblich acted improperly, and determined, for his own selfish reasons and without giving the matter fair consideration, to oppose a Care takeover at all costs.[50] But there is no basis in this record for attributing Lieblich's improper motives to any of the other directors. Care does not claim, and there was no showing, that Lieblich dominated the board or controlled the other directors.[51]

48. The district court placed great weight on the fact that the stock sale to Fair Lanes reduced Care's interest below the one-third, or "blocking position" level. We consider this fact to be of little relevance to the issues before us. Care had no enforceable right to its blocking position; under New Jersey law, shareholders must simply recognize the possibility that their positions may be diluted by the issuance of new shares. See N.J.Stat.Ann. § 14A:5–29(1) (West Cum.Supp.1979) (no preemptive rights unless specified in charter).

49. This finding was made in the context of the court's conclusion that the proposed merger would not in fact enhance the depth of management of the new company, a conclusion echoed by Care on this appeal.

50. Most notable was the fact that Lieblich's view of the dollar value of the Fair Lanes merger proposal was apparently not affected in any way by his learning that, contrary to his prior assumption, certain Fair Lanes assets were to be excluded from the deal.

51. Most of the directors appear to have been substantial shareholders. Treadway's 1977 proxy statement reflected that Dobrow owned 26,416 shares of Treadway common stock (plus

To the contrary, there was evidence that the directors did in fact exercise their independent judgment. *See* 3A Fletcher, *supra* at § 1039 ("when courts say that they will not interfere in matters of business judgment, it is presumed that judgment—reasonable diligence—has in fact been exercised").

The record as to what steps the Treadway directors took, and exactly what information they sought, preparatory to the exercise of their judgment is somewhat sparse. Care would have us believe they did nothing. A close reading of the record, however, reveals that they had engaged an investment banking firm to negotiate and help them evaluate proposed mergers; that between meetings of the Treadway board they (other than Browne and deJourno) were informed of negotiations with Fair Lanes; that during the negotiations they sent Swordco to Fair Lanes armed with a number of questions to which they wished answers;[52] that they asked Swordco for pro forma balance sheets for the combined company; that they adjourned their deliberations for one week thereafter to reflect on the information they had received and to obtain more;[53] and that they conditioned their approval of the proposed transactions on obtaining an opinion from Swordco that the transactions were fair to Treadway.

Thus the record provides no adequate basis for finding that Care carried its burden of proving that the directors did not exercise their judgment in good faith, or that any other circumstances make the business judgment rule inapposite. Care having

failed to establish any basis on which the stock sale to Fair Lanes should be held improper, we reverse the judgment below insofar as it enjoined the voting of Fair Lanes' shares.

## IV. DISPOSITION

Finally, we take up the question of the proper disposition of this case. We are troubled by the posture in which this question is presented. The proxy contest for the March 20 shareholders' meeting was conducted after trial and while the case was *sub judice*. On March 3 the district court issued tentative findings of fact, most of which were adhered to in the court's final decision. The court ordered, however, that these tentative findings not be mentioned in the parties' proxy statements. Thereafter, the court relaxed this ruling to permit, but not require, the parties to disclose tentative findings that were "adverse" to them. Care thereupon adverted to, and sought to explain away, the court's finding as to the misleading Schedule 13D amendments. Treadway apparently felt barred from using any of the tentative findings that were adverse to Care, Browne or deJourno, and chose not to advert to any that were adverse to its other directors.

Our difficulty with the district court's order is that it appears to have kept from shareholders material information relating to the responsibility, diligence and integrity of candidates for election to the Treadway board. The order prevented Treadway, for example, from disclosing the court's find-

$25,000 principal amount of convertible debentures); Gluckman owned 16,213 shares (plus $66,600 principal amount of convertible debentures); Cole owned 5,981 shares (plus $29,000 principal amount of convertible debentures); Mills owned 7,001 shares (plus $15,000 principal amount of convertible debentures); McDonnell owned 1000 shares; and Brassler owned 500 shares.

52. That the record does not reveal the substance of these questions is in fact of little importance. Once it becomes clear that the directors have exercised their business judgment, they will not be second-guessed by the courts: "What has been uncovered and the relative weight accorded in evaluating and bal-

ancing the several factors and considerations are beyond the scope of judicial concern." *Auerbach v. Bennett,* 47 N.Y.2d 619, 393 N.E.2d 994, 1002–03 (1979).

53. Care has also argued, and persuaded the district court, that bad faith should be inferred from the haste with which the Treadway-Fair Lanes negotiations proceeded, and from the very terms agreed to, which Care asserts grossly disadvantaged Treadway. We see nothing in the course of the board's deliberations, nor in the agreements themselves, that would permit the drawing of such an inference with regard to the directors other than Lieblich.

ings that Browne had repeatedly misrepresented Care's intentions regarding Treadway, and that Care's Schedule 13D's had contained similar misrepresentations. At the same time Care was barred from disclosing the findings that Lieblich had determined in February 1979 to oppose a Care takeover in order to save his own position with Treadway; and that Lieblich, who originally believed that all of Fair Lanes' assets would be included in the proposed merger, continued to support the merger on essentially the same price terms after he learned of the exclusions, even though he never received a complete analysis of the value of the excluded assets.

This information about the conduct of two of the nominees must be considered material to the shareholders' voting decision. The district court's order thus squarely conflicted with the spirit of § 14(a) of the 1934 Act, 15 U.S.C. § 78n(a) (1976), which section embodies a strong policy in favor of full disclosure of all material facts to the voting shareholders. *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 381, 90 S.Ct. 616, 620, 24 L.Ed.2d 593 (1970); *J. I. Case Co. v. Borak*, 377 U.S. 426, 431–32, 84 S.Ct. 1555, 1559, 12 L.Ed.2d 423 (1964). And while the parties have not yet asserted any § 14(a) claims, it is difficult to envision meaningful litigation of § 14(a) issues where the district court has in effect ordered, in the middle of the proxy fight, that certain facts not be disclosed by some of the contestants. Accordingly, we see no alternative but to remand for the district court to order a new election.

Affirmed in part, reversed in part, and remanded. No costs.

FEINBERG, Chief Judge (concurring in part and dissenting in part):

I concur in that part of the majority opinion that affirms the ruling of the district court that Care Corporation and Cowin did not violate any duty to Treadway. However, I dissent from the majority's re-versal of the ruling of the district court that the issuance and sale of shares to Fair Lanes was improper.

The majority states that the district court did not apply the "business judgment rule" to the Fair Lanes transaction. The majority then applies that rule, and concludes, contrary to the district court, that the transaction cannot be set aside. In reaching this conclusion, the majority argues that there is evidence in the record "that the directors did in fact exercise their independent judgment." But that is not the question before this court. Rather, the question for us is whether the district court, in the face of *some* evidence of independent judgment and reasonable diligence, could find the contrary evidence to be more weighty, and could reasonably conclude that the outside directors did not exercise sufficiently independent judgment and reasonable diligence. On the record before us, I am not prepared to hold as a matter of law that the issue can only be decided one way.

For example, the district judge found that the two earlier proposed transactions with the same objective between Treadway and Fair Lanes had been prevented from occurring by disinterested third parties: The first was stopped by the American Stock Exchange, which refused to list the shares involved unless shareholder approval was secured; the second was blocked by the district court itself, which was highly suspicious of the haste, terms, and purposes of the transaction. In light of these findings, the district court may well have concluded, without saying so in explicit terms, that the outside directors were properly put on notice, by these aborted transactions, of the doubtful nature of Lieblich's plans and motives, and that in acquiescing in the third transaction, they failed to exercise that degree of reasonable diligence and independent judgment that is always required of directors, and is a prerequisite to application of the business judgment rule.[1] Under

---

1. *See* 3A *W. Fletcher, Cyclopedia of Private Corporations* § 1039, at 38 (M. Wolf rev. 1975) ("[T]he so-called 'business judgment rule' does not conflict with the concept of negligence . . . . [W]hen courts say that they will not interfere in matters of business judgment, it is

these circumstances, the furthest that I would go in the direction of the majority opinion would be to remand this case to the district court, with directions to reconsider the actions of the outside directors more fully and to state explicitly whether the business judgment rule applies, and if not, why not.[2]

Even though I therefore cannot concur in the decision to insulate the Treadway-Fair Lanes transaction from judicial scrutiny, I am gratified that the majority is requiring a new election. The shareholders will thus gain the benefit of all the information regarding incumbent management and Care that was collected by the district court, which the majority rightly refers to as "material."

## ON PETITION FOR REHEARING

KEARSE, Circuit Judge:

Counterclaim plaintiffs–appellees Care Corporation, Dr. Robert W. Browne, and Philip deJourno (hereinafter collectively referred to as "Care") have sought a rehearing of that portion of our decision of August 12, 1980, pp. 357–386, which reversed the judgment of the district court and allowed Fair Lanes to vote the 230,000 shares of Treadway Companies Inc. common stock which it purchased in order to preserve the possibility of a merger between Fair Lanes and Treadway. Since Care has not called to our attention any "points of law or fact which . . . the court has overlooked or misapprehended," (Fed.R. App.P. 40(a)), the petition is denied.

 Care's principal contention here is that the law with respect to stock transactions to affect control of the corporation regards sales and purchases differently, and that a sale is *"malum prohibitum."* First, we note that Care's claim that "universally articulated state law absolutely proscrib[es] the *sale* of stock" to affect control of a corporation (Petition at 1, emphasis in origi-

nal) is simply not supported by the cases. Sales of stock to affect control have been upheld, for example, in *McPhail v. L. S. Starrett Co.,* 257 F.2d 388, 394–96 (1st Cir. 1958); and *Northwest Indus., Inc. v. B. F. Goodrich Co.,* 301 F.Supp. 706, 712 (N.D.Ill. 1969). That these cases were decided in federal courts does not alter the facts that they applied state law and that they have subsequently been cited with approval by state courts. *See, e. g., Kors v. Carey,* 39 Del.Ch. 47, 158 A.2d 136 (1960); *Condec Corp. v. Lunkenheimer,* 43 Del.Ch. 353, 230 A.2d 769 (1967).

Further, Care's attempted distinction between sale cases and purchase cases is an artificial construct that obscures rather than illuminates the law. The operative question in the cases is not whether the issuing corporation bought or sold, but whether the transaction was designed to perpetuate the incumbent management's control. The general principle, cited in *McPhail v. L. S. Starrett Co., supra,* is as follows:

"Directors cannot take advantage of their official position to manipulate the *issue* and *purchase* of shares of the stock of the corporation *in order to secure for themselves the control of the corporation and then to place the ownership of the stock in such a position as will perpetuate that control.* Such action constitutes a breach of their fiduciary obligations to the corporation and a wilful disregard of the rights of the other stockholders."

(257 F.2d at 394, emphasis added; quoting *Anderson v. Albert & J. M. Anderson Mfg. Co.,* 325 Mass. 343, 346–47, 90 N.E.2d 541, 544 (1950). State courts, like the federal courts in *McPhail* and *Northwest Industries, supra,* have acted on this principle. Thus where a sale has been made to effect, but not maintain, control, it has been upheld. *See, e. g., Yasik v. Wachtel,* 25 Del.Ch. 247, 17 A.2d 309 (1941) (shares sold

---

presupposed that judgment—reasonable diligence—has in fact been exercised.").

**2.** Such a remand would also give the district court an opportunity to consider the question,

first raised by the outside directors on appeal, whether they are properly held to a less strict standard of diligence and care than inside directors are.

transferred voting control, but court found "no agreement or arrangement" by which management would participate in the owning or voting of the shares; complaint therefore dismissed); *Cummings v. United Artists Theatre Circuit, Inc.*, 237 Md. 1, 204 A.2d 795, 805 (1964) ("There is no merit to the suggestion that Skouras had the board enter into this agreement to perpetuate his control. The control, it is true, would be transferred to the Naifys who were on friendly terms with Skouras, but there is no evidence of an agreement, express or implied, under which Skouras would retain actual control"; injunction denied.) Where a sale has been made in order to retain control, it has been set aside. *E. g., Elliott v. Baker*, 194 Mass. 518, 80 N.E. 450 (1907) (sale to third person found to have been made with the "secret understanding" that stock would be voted to keep management in control; sale set aside); *Kullgren v. Navy Gas & Supply Co.*, 110 Colo. 454, 135 P.2d 1007, 1011 (1943) (issuance of stock "to avoid enforced separation from what was no mean employment"; sale and voting of stock restrained).[1] And where a purchase has been made in order to retain control it has been held improper. *See, e. g., Bennett v. Propp*, 41 Del.Ch. 14, 187 A.2d 405, 408 (1962) ("the purchases were made to pre-serve management control"; officer who caused the purchases held liable); *Petty v. Pentech Papers*, 347 A.2d 140, 143 (Del.Ch. 1975) ("use of corporate funds to purchase corporate shares primarily to maintain management in control is improper"; purchase enjoined).

■ By focusing on whether or not the transaction will perpetuate management's control, the cases take a normal first step in business judgment analysis, since the issue of self–perpetuation is but an aspect of the fundamental threshold question, "Is the director or officer interested in the transaction?" In the present case, the evidence of record required that this question be answered in the negative. As discussed in greater detail in our August 12 opinion, at 383–384, the purpose of Treadway's sale of stock to Fair Lanes was to facilitate a merger between Treadway and Fair Lanes; Fair Lanes had made the sale a precondition to negotiations. Neither initially nor in the present petition has our attention been directed to any evidence suggesting that the merger talks were disingenuous or that the Treadway directors did not seriously seek a merger with Fair Lanes.[2] Nor is there any question as to the

1. Care's heavy reliance on the result in *Condec Corp. v. Lunkenheimer, supra*, is misplaced since important factual aspects of *Condec* are readily distinguishable. *Condec* involved Lunkenheimer Company's attempt to sell its assets to U.S. Industries Corporation ("U.S.I.") in order to fend off a takeover by Condec Corporation. The agreement for the sale of assets was immediately preceded by an agreement for an exchange of 75,000 shares of Lunkenheimer stock for a like number of shares of a U.S.I. subsidiary; the exchange was conditioned on the consummation of the sale of assets. The exchange agreement was successfully challenged by Condec on the basis of facts not established in the present case. The most important of these was the court's finding that the Lunkenheimer management would apparently retain their positions if the U.S.I. transactions were consummated, but would lose those positions if Condec took over. 230 A.2d at 773-74. Further, the court found that the exchange brought no cash into Lunkenheimer's treasury and was not in furtherance of any proper corporate purpose. *Id.* at 777.

2. Care's contention that there were dispositive findings of the district court that were "not overturned by this Court" is belied by our original opinion. For example, with respect to whether the purpose and effect of the sale to Fair Lanes were to perpetuate management's control, we pointed out the error in the district court's focusing solely on the imminent proxy contest at the annual meeting, in disregard of the ultimate goal of a merger with Fair Lanes (at 381–384). Further, as to whether the Treadway directors other than Lieblich acted in bad faith, or had an interest in the transaction, or acted for an improper purpose, we held that "the evidence does not permit a finding that Care carried [its] burden." (At 383; *id.* at 382–384.) And our observation that the Treadway board instructed its investment bankers to study Care and received a report that a combination with Care would not be in Treadway's best interests (at 365), together with our conclusion that there was no evidence of any bad faith on the part of any director other than Lieblich, obviously rejected, as to

fact that upon the planned merger, all Treadway directors—other than Lieblich—were to lose their positions. The fact that the sale of stock would allow some of those directors, despite the proxy contest at the annual meeting to hold office until the merger with Fair Lanes could be completed, must be evaluated in light of the planned termination of their incumbency upon consummation of the merger. In the circumstances it could not properly be found that the purpose of the sale was to perpetuate management's control.

The petition for rehearing is denied.

FEINBERG, Chief Judge (dissenting):

I adhere to the views set forth in my dissenting opinion in this case. Accordingly, I dissent from the denial of a rehearing.

the directors other than Lieblich, the district court's conclusion that "no good faith effort was ever made" by the Treadway board to investigate Care.